UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DISTRICT

| | |
|---|---|
| **ANJANETTE BEAVER,** | **2:21-CV-10750-TGB-EAS** |
| Plaintiff, | HON. TERRENCE G. BERG |
| vs. | |
| **MACOMB COUNTY,** a Michigan Charter County, | **ORDER DENYING DEFENDANT PATRICIA ROLAND'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 44), DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 45), GRANTING IN PART AND DENYING IN PART MACOMB COUNTY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 46), AND GRANTING IN PART AND DENYING IN PART SPITZ DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 47)** |
| **DANIEL SPITZ,** in his individual and official capacity, | |
| **SPITZ PATHOLOGY GROUP, PLLC,** a Michigan professional limited liability corporation, | |
| **ANDREW MCKINNON,** in his official and individual capacity, | |
| **PATRICIA ROLAND,** in her official and individual capacity, | |
| **WILLIAM RIDELLA,** in his official and individual capacity, **and** | |
| **JACQUELINE FONTENOT**, in her official and individual capacity, | |
| Defendants. | |

Plaintiff, Anjanette Beaver, was employed as a Medical Examiner Investigator with the Macomb County Medical Examiner's Office, a component of the Macomb County Health Department, from July 2015 through March 21, 2021. During that time, Dr. Daniel Spitz and Spitz Pathology Group, PLLC ("Spitz/SPG") served as Chief Forensic

1

Pathologist for Macomb County pursuant to a four-year contract. Beaver alleges that during her employment with the Macomb County Medical Examiner's Office, Defendants Macomb County, several of its employees, and Spitz/SPG subjected her to a sexually- and racially-charged hostile and retaliatory work environment.

After filing various complaints with Macomb County administrators and the Equal Employment Opportunity Commission ("EEOC"), Beaver commenced this action alleging that the Defendants subjected her to a hostile work environment based on sex and race, engaged in retaliatory behavior, and made working conditions so intolerable that she was constructively discharged. Beaver filed hostile work environment and retaliation claims under state and federal anti-discrimination laws, as well as retaliation under other state and federal laws and the United States Constitution.

Following the close of discovery, Beaver and the Defendants filed motions for partial summary judgment and for summary judgment. ECF Nos. 44, 45, 46, 47. The motions have been fully briefed. Upon review of the parties' filings, the Court concludes oral argument will not aid in the resolution of these matters. Accordingly, the Court will resolve the present motions on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2).

For the reasons that follow, those motions are granted in part and denied in part.

# I.   BACKGROUND

## A.  The Parties

Plaintiff Anjanette Beaver, a Native American, was employed with the Macomb County Medical Examiner's Office ("MEO") as a Medical Examiner Investigator from July 2015 through March 21, 2021. Beaver Dep. 18–25, 30, ECF No. 45-3, PageID.853–56. As a Medical Examiner Investigator, Beaver, a retired sergeant with the Detroit Police Department, was responsible for investigating the cause and manner of an individual's death. ECF No. 45-5.

During the time period relevant to this action, Defendant William Ridella was the Director of the Macomb County Health Department, and Defendant Andrew McKinnon was the County's Director of Human Resources and Labor Relations. Defendant Patricia Roland was the Manager of Operations for the MEO from 2013 until she was terminated on August 10, 2020. ECF No. 45-8, PageID.1008–09, 1012–13, 1049; ECF No. 45-34. Roland was temporarily replaced with Lead Forensic Investigator Gretchen Terebesi, who was named Interim Office Manager, until Defendant Jacqueline Fontenot became the new Office Manager of the MEO on December 14, 2020. ECF No. 45-8, PageID.1060; Fontenot Dep. 13, ECF No. 45-19, PageID.1483.

During Beaver's time working at the MEO, Defendants Daniel Spitz, M.D., and his corporation, Spitz Pathology Group, PLLC (collectively, "Spitz/SPG"), were under contract with Macomb County for

3

Dr. Spitz to serve as the County's Chief Forensic Pathologist for a four-year term. ECF No. 1-2. Pursuant to that contract, Spitz/SPG served as Macomb County's Chief Forensic Pathologist and Administrator, responsible for carrying out forensic pathology duties pursuant to MCL § 52.201, as well as the administration and management of the MEO. *Id.* PageID.48. The contract provided that Spitz/SPG's duties included, but were not limited to: interviewing candidates and making hiring recommendations; providing new staff orientations and training to staff; providing "professional supervision and direction" and "directly oversee[ing] the day-to-day activities of all professional and support staff" including "approval of staff schedules, leave requests, and overtime assignments;" establishing quantitative and qualitative goals for the MEO; evaluating policies and procedures; conducting staff performance evaluations; providing recommendations on staff discipline and work improvement plans; managing the MEO budget; and participating in public speaking engagements. *Id.* PageID.50-52.

## B. Alleged Hostile Work Environment at the MEO Based on Sex and Race

Beaver alleges she found the work environment in the MEO to be offensive and tainted with sexual and racial animus since joining the Office in July 2015. ECF No. 1. The Medical Examiner Investigators and Morgue Specialists worked together in a one-room "Death Investigator's" office within the MEO, furnished with eight shared cubicles and

workstations with computer screen monitors visible to all the employees. Terebesi Dep. 49–50, ECF No. 45-13, PageID.1242–43; Dr. Spitz Dep. 16–17, ECF No. 45-7, PageID.958. Patricia Roland, the Office Manager, had a separate office but she visited the investigator's room up to 10 times a day. Roland Dep. 46, ECF No. 45-12, PageID.1177; Terebesi Dep. 51, ECF No. 45-13, PageID.1243. Dr. Spitz would also visit the investigator's room approximately once a week. Spitz Dep. 105–06, ECF No. 45-7, PageID.980–81 ("There were times I would maybe go in once a week. Sometimes it would be longer than that. Sometimes it would be more frequent than that. It was quite variable."); Terebesi Dep. 50, ECF No. 45-13, PageID.1243.

According to the deposition testimony, Morgue Specialists Veronica Stout and Brittany Hella, and Investigator Leanna Parrent, were a "clique" within the MEO known as "The Girls." Terebesi Dep. 13, 17–18, 76, ECF No. 45-13, PageID.1233–35, 1249. There was a perception that "The Girls" were favored by Roland and Dr. Spitz. *Id.*; Beaver 101–03, ECF No. 45-4, PageID.876. Beaver described "The Girls" as "collectively a group that operated somewhat outside the rest of the office" and who "received preferential treatment basically" with respect to "work and schedules and resources." Beaver 58–60, ECF No. 45-25, PageID.1788; *see also* Terebesi 58, ECF No. 45-13, PageID.1245 (agreeing that "there wouldn't be a correction" for The Girls' bullying of a coworker "because of this clique, because Roland, you know, favored the girls").

Beaver states that starting in 2016, "The Girls"—Hella, Stout, and Parrent—openly displayed pornographic images of the groin area of males and naked, black male genitalia, including a pornographic photo known as the "Barry meme," as screen savers on the computers in their cubicles and on sticky notes.[1] *See* Photos, ECF No. 45-33. Other screen savers contained offensive sexual words and phrases such as "cunt," "bitch," "Vagina," "anal fisting," "Fuck Bitches. Get Money," "Suck my Dick," "You're a cunt," "Anal beads," and "I suck dick for money." Beaver 26–27, ECF No. 45-25, PageID.1780; Photos, ECF No. 45-33, PageID.2010–19, 2035–54. One of the photos shows dry autumn leaves next to a fence in the snow, with the phrase "Maybe genocide isn't such a bad idea" written next to the leaves. ECF No. 45-33, PageID.2040. "The Girls" also made drawings of penises and distributed confetti in the shape of male genitalia in the investigator's room. Beaver 60–65, ECF No. 45-4, PageID.865–67; Terebesi 48–49, 110–11, ECF No. 45-13, PageID.1242, 1258; ECF No. 45-32. There was also a photograph of a large woman with the caption "I am moist" posted in the office next to Stout's desk. Photo, ECF No. 45-33, PageID.2078. In or around early May of 2020, Parrent also texted a copy of the "Barry meme" to Beaver. Beaver 63, ECF No.

---

[1]    Beaver describes the "Barry meme" as "a pornographic, obscene picture of a large naked Black male sitting on the edge of a bed with his erect penis exposed." ECF No. 1, PageID.13.

6

45-4, PageID.866. Beaver was offended by the meme and immediately deleted the text. Beaver 73–74, ECF No. 45-25, PageID.1791–92.

On or about May 21, 2020, Hella asked Parrent to prepare a birthday cake for Stout's birthday based on the pornographic "Barry meme" and to bring the cake to the office. Parrent Statement, ECF No. 45-27, PageID.1848. Roland was aware of the proposed cake design, assured Parrent that it would be okay to bring that cake to work, and she even printed a color copy of the "Barry meme" to use as a topper on the cake at the office. *Id.* The cake was decorated with a paper cut out of the "Barry meme" and with a black and brown-colored penis drawn in frosting, with testicles decorated with coconut. *Id.*; Beaver 151, ECF No. 45-4, PageID.889.

Parrent brought the cake into the office on May 26, 2020, on her day off. Parrent Statement, ECF No. 45-27, PageID.1848. She showed it to Roland, Dr. Spitz, and other employees. *Id.* According to Parrent, Roland told Parrent that the cake was fine. *Id.* Roland testified that she did not find the cake sexually explicit, but that she nevertheless told Parrent to "dismantle it." Roland 143–44, ECF No. 45-12, PageID.1203. Parrent states that Dr. Spitz advised her to place the cake in his office until the celebration because Deputy ME Mary Pietrangelo "would not find it humorous." Parrent Statement, ECF No. 45-27, PageID.1848; Roland 76–77, ECF No. 45-12, PageID.1184. Dr. Spitz testified that he ordered the cake to be "either destroyed or discarded or changed in a way

7

that removed the offensive nature of the cake." Spitz 50, ECF No. 45-7, PageID.967. The cake was instead brought out after lunch, the topper was removed, and the cake was sliced and served. *Id.* The leftover cake then sat in the lunchroom until the weekend. ECF No. 45-27.

Beaver did not eat any of the cake. She thought that it was "disgusting" and she asked Terebesi why it was allowed in the office. Beaver 113, 153, ECF No. 45-4, PageID.879, 890. Terebesi did not respond. *Id.* Parrent states that "[j]okes and pranks like the cake, the changing of desktops, and decorating the office with phallic symbols was an accepted and tolerated part of the office culture" at the MEO, and "almost everyone knew about it, including senior management." ECF No. 45-27.

Beaver states that following the birthday celebration and her stated displeasure with the cake, Roland, Dr. Spitz, Hella, and Stout began for the first time increasingly scrutinizing and criticizing Beaver's investigative work, such as when she made a typographical error or when she had to amend a preliminary report, which she asserts is common practice for investigators in the MEO. Beaver 31–33, ECF No. 45-25, PageID.1781; *see also* Krieger 23, ECF No. 45-26, PageID.1837 (stating that Roland, Hella, and Stout would talk about Beaver, "just taunting and negative talks about her," "just within earshot of all the other investigators. It was very uncomfortable."). Beaver further asserts that "there was suddenly radio silence as far as conversation or

communication within the office when [she] was around." the MEO. Beaver 31–33, ECF No. 45-25, PageID.1781. Beaver testified that "they began to put the pictures of the men's groins but covered with a speedo bathing suit as opposed to them being totally naked," and she "overheard Roland tell Stout, make sure you cover that when she's [Beaver] here." *Id.*

Beaver said she had complained to Terebesi, her first line supervisor, as early as 2016 about the hostile work environment in the office, but that Terebesi "encouraged" Beaver not to complain and "advised [her] that other people had complained prior to [her] and nothing had occurred" or that [p]eople had been terminated who complained." Beaver 49, ECF No. 45-4, PageID.863. Beaver and another former Investigator, Kristina Krieger, both stated that former Investigator Maia Elgohail was terminated on December 5, 2017, just days after complaining to Roland about harassment and bullying by Hella and Stout. *Id.* PageID.862; Krieger 20–22, ECF No. 45-26, PageID.1834–36. Hella and Stout had referred to Elgohail as a "lesbian" or "lesbo" and asked Beaver if Elgohail was gay and if she liked that "weirdo." Beaver 45–46, ECF No. 45-4, PageID.862. Elgohail filed a claim of workplace harassment and bullying with Roland on November 7, 2017. ECF No. 45-31, PageID.1991. The MEO investigated the complaint, including Eloghail's many allegations of harassment and bullying at the MEO, and found on November 20, 2017 that "[t]here appears to be no

9

violation of County policy" and "a lack of aggregious [sic] behavior that would constitute workplace bullying." *Id.* PageID.1991–93. That investigation noted that Terebesi and Dr. Pietrangelo both stated that Elgohail performed well in her job. *Id.* Elgohail was terminated on December 5, 2017. ECF No. 45-31. She filed a charge of discrimination on April 28, 2018 claiming that she was subjected to harassment based on her national origin and religion and subjected to a sexually-tainted work environment by Hella, Stout, and Roland. *Id.* PageID.1982. On December 13, 2019, the EEOC found reasonable cause that Elgohail was subjected to sexual harassment and that she was discharged in retaliation for engaging in protected activity. *Id.* PageID.1994–96 (but finding insufficient evidence of harassment based on national origin or religion).

On July 10, 2020, Beaver sent an email to McKinnon and the Macomb County Executive about the "ongoing hostile work environment within the MEO since I have been here [in 2015]" that is "not only ignored by managing personnel, but participated in by the supervising staff, including the Chief of Operations." ECF No. 45-32. Beaver states:

> Within the past two years, the hostile work environment has progressively worsened and the harassment amplified. There have regularly been inappropriate sexual images of penises or groin areas of men displayed on more than one computer in the office. The computers are owned and maintained by the county and only accessible via password sign-in. The pornographic computer screen savers are left in view of all

10

> office personnel, openly displayed, and altered frequently. Phallic images drawn on papers, balloons and sticky notes have been observed around the office. Penis shaped confetti has been left laying on desks, the office counters, and thrown on the floor. The pornographic images have commonly displayed depictions/photographs of African American male genitalia [i.e., the "Barry meme"].

*Id.* Beaver further described the birthday party with the "penis cake incident" and stated that "[s]ince that time, the Office Manager and personnel have continued to display inappropriate screensaver photographs on their monitors, which are openly exhibited in the shared office." *Id.*

Beaver also complained of "blatant and overt racist communications from the Office Manager and other employees who participate in that specific social/professional circle in the office." *Id.* She states:

> I have often been given the responsibility of performing decedent identifications with African American families who were considered hostile or "difficult." I have also been told, "Go deal with your people." Recently, a distraught family appeared at the Office and damaged the doors. I called both 911 and the Office Manager to notify her of the incident. The Office Manager later called back and asked, "Are they black?" The Office Manager then stated, "They can break the doors and nothing will happen to them with everything going on, because they are black. They'll just say they were upset."

*Id.* Beaver states that "[t]his demeanor and these statements are routinely exhibited by supervision and staff in the course of the Office's interaction with African American families," and that "[a]s an Indigenous

woman of color, [she] find[s] this conduct and these statements offensive and appalling." *Id.* Beaver states that when she was ordered to deal with "your people," Roland, Terebesi, Hella, and Stout would chant "Fight. Fight. Fight." Beaver 129–33, ECF No. 45-4, PageID.883–84; Terebesi 55–58, ECF No. 45-13, PageID.1244–45.

A few days later, on July 14, 2020, Beaver filed her first Charge of Discrimination with the EEOC. ECF No. 1-3, PageID.57–60. Beaver claimed that she has been "subjected to daily act[s] of sexual harassment via inappropriate sexual images of penises or [the] groin areas of men on more than one computer in the office," and that "a cake was brought into the office decorated with a dark brown/black penis drawn onto the top with icing." *Id.* She further claimed that "[t]here are derogatory statements made relative to the race of the family due to the current climate involving 'black' people" in which "African American families are considered hostile." *Id.* She states that "[t]his demeanor and these types of assertions are routinely exhibited by supervision and staff in the course of interaction with African American families." *Id.*

The Macomb County Human Resources department investigated Beaver's allegations in her July 10, 2020 letter to McKinnon and placed Stout, Hella, Parrent, and Roland on paid administrative leave. McKinnon 31–34, 37–38, 69, 75–77, ECF No. 45-10, PageID.1101–03, 1110, 1112. During the course of the County's investigation, McKinnon interviewed Beaver, conducted an inspection of the MEO, including the

computers, and conducted recorded interviews with "pretty much everyone in the department." *Id.* 63–73, PageID.1109–11. The County retrieved numerous photographs from the computers of Stout and Hella, including approximately 25 photographs of pastoral scenes which contained vulgar phrases such as "cunt," "bitch," "Vagina," "anal fisting," and "Suck my Dick," as well as various photos of the "Barry meme" from Stout's desk drawer and an "I am moist" photo of an obese woman on the wall of Hella's work station. Photos, ECF No. 45-33. As a result of the investigation, Roland, Stout, and Hella were terminated and Parrent was allowed to resign. McKinnon 101–02, ECF No. 45-10, PageID.1120. Roland's termination letter stated:

> Based on the results of this investigation, it has been determined that you have violated the County Discrimination and Harassment Policy; have failed to ensure a work environment that is free from harassment, discrimination and retaliation; have failed to enforce and ensure compliance of the County Internet and Network Use Policy; have failed to enforce and ensure proper use of County facilities; and have acted in an inappropriate and unacceptable manner in the workplace. Further it has been determined that you were less than truthful during the investigation.

ECF No. 45-34.

Roland challenged her discharge through binding arbitration. ECF No. 45-36. The Union argued in the arbitration proceeding, in part, that Roland was not a "supervisor" with authority to discipline, hire, or fire employees, that Terebesi was the "go-to person" for employees and

involved in day-to-day activities at the MEO, and that there were other layers of management that were not disciplined. Arbitration Decision, ECF No. 45-15, PageID.1326–28. The County argued that "[t]here is no question that [Roland] was, in fact, the supervisor" and that a sexually hostile environment existed at the MEO for years. Macomb County Brief, ECF No. 45-22, PageID.1620–24; *id.* PageID.1617 ("In total, all the photographs support a claim of a hostile work environment by the various employees."). The Arbitrator found that Roland was a "supervisor" responsible for the hostile work environment reported by Beaver and therefore just cause existed for her termination. ECF No. 45-15, PageID.1336–37. The Arbitrator further found:

> ample evidence of both nonverbal and sexual harassment at the Medical Examiner's office under the management and direction of the Grievant Patricia Roland. That conduct had the purpose and effect of substantially interfering with an individual's work performance in creating an offensive environment. It also created a hostile work environment, contrary to County policies and work rules. … The unwelcome conduct resulted in the workplace atmosphere being offensive. Such a hostile work environment occurs when the workplace is permeated with an environment of inappropriate photographs and sexually explicit photos. It has no place in a professional atmosphere of the Medical Examiner's office for Macomb County. It affected the vast majority of employees working there.

*Id.* Roland's termination was sustained on November 1, 2021. *Id.* PageID.1338. Dr. Spitz testified that, following her termination from the Macomb County MEO, Roland was hired as a part-time employee to work

with him at St. Clair County Medical Examiner's Office. Spitz 11, ECF No. 45-7, PageID.957.

### C. Alleged Retaliation and Retaliatory Work Environment at the MEO

Beaver contends that after she filed her complaints against Roland and "The Girls," the sexually hostile work environment at the MEO was replaced by a retaliatory one. Beaver 25, 40–42, 44–45, ECF No. 45-25, PageID.1779, 1783–84. According to Beaver, Union Representative Erick Acre, Terebesi, and she herself were "targeted by Spitz for their involvement for telling the truth during the investigative process" of the racial and sexual harassment claims *Id.* at 42, PageID.1784. Dr. Spitz "was very unhappy" when the County terminated Roland and "The Girls" and he wanted them rehired, going as far as to advocate on Roland's behalf at her arbitration hearing. McKinnon 78–79, 102–04, 133–34, ECF No. 45-10, PageID.1113, 1120–21, 1128; Terebesi 101–02, ECF No. 45-13, PageID.1255–56. According to McKinnon, sometime after Beaver complained about Roland and "The Girls," Dr. Spitz reported for the first time to him that Beaver "had not performed her duties appropriately and should be disciplined." McKinnon 128–29, ECF No. 45-10, PageID.1127. Beaver was not disciplined however, *Id.*

On August 31, 2020, Beaver sent an email to McKinnon and other County officials, including County Executive Mark Hackel, about the "hostile environment" in the MEO. ECF No. 52-3. Beaver stated in that

email that "[s]ince the submission of the report [regarding the sexually hostile work environment in the MEO], I have been subjected to numerous incidents of retaliation by Dr. Spitz." *Id.* She stated:

> I have been subjected to increased scrutiny and work critique which is also documented in text messages with me and Dr. Spitz. Dr. Spitz displays erratic behavior in my presence by grunting and making noises as he walks past me. Dr. Spitz has stood at the end of my desk area with his hands on his hips glaring at me while saying nothing. Dr. Spitz walks through the investigator's area and glowers menacingly at me as he traverses the length of the office, until he is out of view. This behavior and Dr. Spitz's overall hostile demeanor have been displayed in the presence of other investigators.
>
> This unpredictable and bizarre behavior has me concerned for my safety in his presence and while working alone in the Medical Examiner's Office.

*Id.* Beaver further asserted that "Human Resources Director McKinnon, and Executive Hackel, in their denial of authority over 'contract employees,' continue to shield Dr. Spitz from accountability for his discriminatory, racist, and now retaliatory actions." *Id.*

Beaver has further testified that:

> Dr. Spitz was very combative and hostile and openly hostile, specifically targeting me, Terebesi and Acker [Acre]. He was in a constant state of irritability, he was derisive, he was condescending on any communications. He refused to communicate a lot of the times and that was a complaint not just made by me. He was just very erratic and belligerent and at one point in that behavior I became fearful for my safety when I was alone with him. And I also advised the county of that.

Beaver 45–46, ECF No. 45-25, PageID.1784.

Terebesi similarly testified that Dr. Spitz's criticisms of Beaver seemed to increase after her complaint about the racially and sexually hostile work environment at the MEO, questioning her handling of investigations. Terebesi also stated that Dr. Spitz's mood changed and he would become more angry and "quite intense" when the newspaper articles about the hostile work environment incident came out. Terebesi Vol. I 70–71, 146–47, Vol. II 59–61, ECF No. 45-13, PageID.1238, 1267, 1288.

Macomb County investigated Beaver's complaints against Dr. Spitz under the County's Human Resources and Labor Relations Discrimination and Harassment policy, which included interviewing Dr. Spitz regarding Beaver's complaints. Spitz denied them. Semlow Aff., ECF No. 46-7, PageID.2137–38; Spitz 148–49, ECF No. 45-7, PageID.991. The County found that there was no evidence of any threats by Dr. Spitz, and "[a]lthough the behavior from Spitz seemed childish, there was no evidence that Spitz was trying to force Beaver to quit or in any way modify her work assignments," and thus the County was unable to corroborate any violation of County policy. Semlow Aff., ECF No. 46-7, PageID.2137–38. Beaver contends that the retaliatory environment worsened after her complaints.

On September 9, 2020, Beaver filed a second Charge of Discrimination with the EEOC. ECF No. 1-5. Beaver alleged in that

Charge that she had been subjected to numerous instances of retaliation by Dr. Spitz for filing her first Charge of Discrimination, including discipline, and harassing and intimidating behavior. *Id.*

### D. Robinette Struckel's Allegations of Retaliation

On September 16, 2020, Robinette Struckel began to work as a new Morgue Specialist for Macomb County. ECF NO. 52-5, PageID.2773. She noticed alleged health and safety violations at the morgue, and on September 18, 2020, Struckel emailed Ridella and McKinnon about the safety issues she observed. She reported that Dr. Spitz's response to her concerns was that her complaints were only a "personal preference." *Id.* 2773–75.

Struckel also addressed in a subsequent email that same day Dr. Spitz's unsolicited comment to her "that the only reason it [the "Barry meme"-themed birthday party] made the news was because of the area the office was located in and people's obsession with dead bodies. If this would have happened anywhere else in the nation, this would not have made news." *Id.* PageID.2772. Struckel wrote that this showed that Dr. Spitz "lacked accountability and responsibility as a leader and as the Chief Medical Examiner and his commentary on what transpired only further condones and creates an oppressive work environment." *Id.* She states that Dr. Spitz's "opinions show clear disregard for the severity of what happened and those that spoke up to create a safe working

environment." *Id.* Struckel then requested to be "placed on paid administrative leave for 90 days while we sort out the next steps." *Id.*

On September 18, 2020, Dr. Spitz emailed McKinnon, Ridella, and County Deputy Executive Al Lorenzo a message about Struckel's complaints, attaching an article titled "No Resting in Peace" from the Seattle Weekly, and stating:

> Thought you all might find this article [https://www.seattleweekly.com/news/no-resting-in-peace/][2] interesting. There are a few others that come up with a simple google search. *Wish we would have known.*
>
> I have reviewed Robinette's email and I am quite certain that all of the safety concerns that she raises are being appropriately handled—except for the possibility of how we are handling formalin. The proper procedure regarding formalin depends on the concentration of formaldehyde in the air when specimen containers are being prepared…..
>
> My conversations with Robinette and her [whistleblowing] history in King County lead me to believe that she is going to be a significant problem and major distraction at the office.
>
> We need people who will work hard, be problem solvers and team players. *We have no need for those who want to create problems and undermine the work we do.*

ECF No. 52-6, PageID.2777 (emphases added).

---

[2]   That article discusses numerous complaints of hostile work environment claims at the Kings County Medical Examiner's Office brought by and involving a number of employees, including Struckel. https://www.seattleweekly.com/news/no-resting-in-peace/ [https://perma.cc/PAR4-V62K]

On Monday, September 21, 2020, Struckel was fired. ECF No. 52-7, PageID.2779; *see also Struckel v Macomb Cnty.*, No. 20-cv-12995, 2021 WL 4034263 (E.D. Mich. Sept. 3, 2021) (Berg, J.). Ridella stated in a letter to Struckel that "[i]t has been concluded that you have not successfully completed your probationary period. Therefore, your employment with Macomb County is terminated, effective September 21, 2020." ECF No. 52-7, PageID.2779.[3]

### E. Erick Acre Complaint of Retaliation

On October 28, 2020, Erick Acre sent an email to Human Resources and Labor Relations Deputy Director Karlyn Semlow titled "Medical examiner's union complaint." ECF No. 52-2, PageID.2683–84. Acre stated that "many of the employees feel they have [been] exposed to a hostile work environment or retaliation from Dr. Spitz," and he listed several examples of such retaliation. *Id.* Acre reported that Dr. Spitz has said that "the employees who no longer work for the county [Roland, Stout, Hella, and Parrent] did nothing wrong and this was all a conspiracy made up by a few employees." *Id.* Acre states that this

---

[3] Struckel brought a lawsuit against Macomb County, Ridella, McKinnon, and Spitz/SPG, claiming she was terminated in retaliation for exercising her First Amendment rights and alleging violations of the First Amendment and Michigan's Whistleblower Protection Act ("WPA"), as well as violation of public policy. *Struckel v. Macomb Cnty., et al.*, Case No. 20-12995 (E.D. Mich.). After surviving motions to dismiss and going through discovery and court-ordered facilitation to reach a settlement, the parties agreed to a Stipulated Judgment of Dismissal on February 27, 2023.

statement "shows that certain employees are being blamed and therefore targeted as retaliation." *Id.* Acre further states that "[c]ertain employees are being questioned more and being told to do more information in regards to cases," but that these requirements do not apply to all employees. *Id.* Acre contends that this behavior is targeted towards certain employees only "till they quit or could be fired." *Id.*

At some point Macomb County retained non-lawyer Kristen Baker of HR/Advantage Advisory to conduct an outside investigation into the claims and allegations raised in Erick Acre's October 28, 2020 complaint regarding unsafe working conditions, hostile work environment, and retaliation. ECF No. 52-2. Baker's investigation began on December 23, 2020 and consisted of interviews of the Medical Examiner Investigators, Morgue Specialists, Drs. Spitz and Pietrangelo, Denise Calhoun, Fontenot, and Terebesi. *Id.* PageID.2646. Baker issued her report on February 15, 2021, in which she concluded that "[i]t is evident that the Medical Examiner's office is dysfunctional. There is a lack of trust and a severe breakdown in communication. However, this Investigator could not substantiate the claims made of hostile work environment or retaliation." *Id.* PageID.2680. She concluded that "it is not evident that employees are being treated differently due to a protected characteristic," and that Beaver and Acre were not subject to retaliation. *Id.* PageID.2680–81. She stated that "the behavior exhibit [sic] by Dr. Spitz, although inappropriate at times and possibly pervasive based on the

examples given and the number of employees who do not like his style, is not severe." *Id.*

### F. Beaver's COVID-19/MIOSHA Complaints

On October 31, 2020, Beaver sent an email to the Macomb County "Covid Communications Team" about the absence of adequate personal protective equipment ("PPE") for Investigators on COVID death scenes. ECF No. 52-8, PageID.2781. Beaver stated that she had been assigned to a death scene that had a confirmed positive COVID-19 decedent and several family members actively experiencing COVID symptoms. *Id.* She conducted as much of the investigation as she could outside but was "directed to enter the home to conduct an investigation." *Id.* Beaver wrote that as the number of such scene exposures increases, she was concerned with exposure to "an uncontrolled environment with minimal PPE," including "an absence of fitted N-95 masks" and "no appropriate means to dispose of contaminated equipment/PPE which is stored in [her] vehicle until a receptacle for disposal is located." *Id.* Beaver complained that investigators' vehicles and clothing become contaminated and that they act "as potential carriers of the Covid19 virus with no proper decontamination procedure" of themselves or their equipment. *Id.* Ridella responded to Beaver by email on November 2, 2020, thanking her and stating that "[y]our comments regarding PPE and proper disposal are very much appreciated as well and we are copying your leadership on this email as they are the proper staff to address this." *Id.* PageID.2782.

Beaver was diagnosed with COVID on November 11, 2020, and she then reported her suspected safety violations to the Michigan Occupational Safety and Health Administration ("MIOSHA") on November 18, 2020. ECF No. 52-9. She complained that "[e]mployees of the Macomb County Medical Examiner['s] Office have not been provided with adequate PPE or fit tested for N95 masks" and that "Investigators have been responding to confirmed positive COVID-19 death scenes while not afforded adequate protection." *Id.* PageID.2785. She also complained that she had "not been provided any way to decontaminate [her] scrubs, [or her] vehicle or equipment while traveling back and forth between these residential homes." *Id.* She further complained that there were no specific guidelines in the MEO for dealing with COVID 19. *Id.* And she indicated that she did not want her name revealed to her employer. *Id.* PageID.2786. Despite this, Beaver claims that Defendants Spitz/SPG, McKinnon, Fontenot, and the County knew of this protected activity because she informed them of her complaint on December 6, 2020. *See* Compl. ¶ 140, ECF No. 1. She alleges that she was then taken off scene responses by Terebesi, at the direction of Ridella, Dr. Spitz, and/or McKinnon. *Id.* ¶ 141.

Beaver states that a MIOSHSA inspector appeared at the MEO on December 9 and December 16, 2020 to inspect the vehicles used by the investigators. At the end of the inspection the agent did not require any changes in the equipment maintained in the vehicles used to respond to

scenes. Terebesi Aff. ¶¶ 6–8, ECF No. 46-9, PageID.2152. On February 18, 2021, MIOSHA notified Fontenot of four "serious" violations at the morgue related to "respiratory protection." ECF No. 52-10, PageID.2809–17.[4] MIOSHA noted that the violations were corrected during the inspection and imposed $6,300 in penalties for the violations. *Id*. These penalties were later reduced to $3,150.00, and were paid by Macomb County. *Id*. PageID.2792.

## G. Alleged Retaliation and Constructive Discharge

Beaver states that on November 30, 2020, when she returned to work from COVID-leave, she received her first ever written "counselling memo" for a disputed "mistake"—failing to advise Dr. Pietrangelo that a case was being brought in for an exam. Terebesi 83–85, ECF No. 45-13, PageID.1251. The counseling memo was not placed in Beaver's Human Resources personnel file but was instead "just something there in the office" file. *Id*. Terebesi testified that this was the first time Dr. Spitz ever

---

[4]     This MIOSHA notification appears to be associated, at least in part, with a separate, earlier complaint filed by former employee Robinette Struckel, Complaint No. 1667347. ECF No. 52-10, PageID.2789–90. Struckel filed an earlier MIOSHA Discrimination Complaint against Macomb County on September 21, 2020. *Id*. PageID.2795. The MIOSHA report states that MIOSHA began an investigation at the MEO on October 14, 2020, and that the report relates to inspection dates of October 14, 2020 through January 14, 2021. *Id*. PageID.2809, 2811. Beaver's MIOSHA complaint is Complaint No. 1695477 and was not filed until November 18, 2020, ECF No. 52-9, after the MIOSHA inspection had already been initiated.

ordered her to submit a written counseling memo on any employee for such an infraction. *Id.* PageID.1252. Terebesi testified that this same issue happened again, much later and with a different investigator who failed to contact Dr. Spitz, and, unlike Beaver, that investigator was not issued a written counselling memo. *Id.* PageID.1251.

On December 14, 2020, Jacqueline Fontenot started working at the Macomb County Medical Examiner's Office as the new Manager of Operations. Fontenot 12–13, ECF No. 45-19, PageID.1483. She had previously worked with Dr. Spitz at the St. Clair County Medical Examiner's Office until December 13, 2020. *Id.*

Beaver complains that on February 18, 2021, shortly after Fontenot stated working in the MEO and the same day MIOSHA issued a citation against Macomb County, Fontenot denied some overtime for Beaver, at the direction of Dr. Spitz. Beaver 93–94, ECF No. 45-4, PageID.874. Fontenot testified that Dr. Spitz directed her to review an overtime slip Beaver had submitted because he claimed the time submitted did not match "the times on his phone." Fontenot 17–20, ECF No. 45-19, PageID.1484–85. Fontenot testified that she initially denied the overtime, but that someone in Human Resources later allowed and paid some of the overtime. *Id.* 43–44, PageID.1491. Fontenot then approved all but 1.66 hours of overtime for Beaver. ECF No. 46-10. Terebesi testified that Dr. Spitz only asked about overtime slips submitted by Beaver and Acre. Terebesi II 76, ECF No. 45-13, PageID.1292. Fontenot

25

further testified that "since I started [at the Macomb County MEO], I'm not aware of anyone else being denied overtime." Fontenot 63, ECF No. 45-19, PageID.1496.

Beaver also complains that she was forced to work midnight shifts and that Fontenot denied a request by Beaver and another employee to trade shifts, after consulting with Dr. Spitz as to how such requests should be handled. Fontenot testified that Dr. Spitz advised that "we generally didn't allow trades." *Id.* 47–48, PageID.1492.

Beaver also complains that Fontenot and the County deducted time from Beaver's leave bank and $300 of COVID relief funds related to COVID leave Beaver had taken in November 2020. Fontenot 23–24, ECF No. 45-19, ECF No. 1486; ECF No. 45-8, PageID.1051 (admitting that Fontenot conducted an audit of Beaver's time records on February 18, 2021); ECF No. 52-12. Fontenot also made a similar adjustment to Erick Acre's leave bank. Fontenot 23–24, ECF No. 45-19, ECF No. 1486.

Macomb County explains that, at the inception of the COVID-19 pandemic, Macomb County added an additional 75 hours of sick time employees could use for COVID-related time off. Szmatula Aff. ¶3, ECF No. 46-12, PageID.2167. With the passage of the federal Emergency Paid Sick Leave Act ("EPSLA"), an additional 80 hours were provided to employees for COVID-related time off. *Id.* As required by the law, Macomb County posted notice of these benefits *Id.* ¶ 4; ECF No. 46-11. Under the County's policy, employees were required to use the 75 County

sick-time hours before the 80 federal COVID hours. Szmatula Aff. ¶ 5, ECF No. 46-12, PageID.2167. Szmatula's audit of all MEO employees revealed that both Acre and Beaver were the only two employees whose hours needed to be adjusted, i.e. the COVIDFED hours were replaced by the COVID19 County hours. *Id.* ¶ 7. Beaver retained the COVIDFED hours to be used in the future and her leave banks reflected the County COVID19 hours were used instead. *Id.* ¶ 8, PageID.2168.

The County further explains that it provided a $5.00 "gratuity" payment for all hours employees worked in the office during COVID. *Id.* ¶ 6, PageID.2167. This gratuity payment was not available for hours worked remotely or while on leave. *Id.* An audit of the records revealed that Beaver had received this gratuity payment for time she was on leave, and thus she received an overpayment. *Id.* ¶¶ 7, 9, PageID.2167–68. The County provided Beaver the paperwork to support the actions taken with regard to her pay. *Id.* PageID.2170–76; ECF No. 46-13.

Beaver caught COVID-19 for a second time on or around February 19, 2021, and she supplied the County with the Family and Medical Leave Act ("FMLA") paperwork necessary to take leave on March 2, 2021. ECF No. 52-15 (stating that Beaver is expected to be out from February 19, 2021 to March 14, 2021). She contends that the County denied, delayed, and demanded more documentation for FMLA leave, claiming that the certification she had provided is insufficient. *Id.*

On March 14, 2021, Beaver notified the County of her constructive discharge in a letter to McKinnon, Dr. Spitz, and Andrew Cox stating:

> As you are all aware, I am the employee who complained of sexual harassment, racism, hostile work environment, noncompliance with Covid-19 safety laws/protocol (including the filing of a complaint with MIOSHA), and retaliation; all of which I observed and experienced at the Macomb County Medical Examiner's Office.
>
> The County has done little to remedy the hostile environment or other unlawful conduct at the Medical Examiner's Office. Instead, the County emboldened Medical Examiner Spitz, and others, to retaliate against me in the hope that I quit. This has caused me enormous distress and fear which is intolerable. Because of the intolerable working conditions at the Medical Examiner's Office, I consider myself constructively discharged, effective immediately.

ECF No. 52-16.

## H. Procedural History

On April 2, 2021, Beaver filed her Complaint in this case against Defendants Macomb County, Dr. Daniel Spitz, Spitz Pathology Group, PLLC, Andrew McKinnon, Patricia Roland, William Ridella, and Jacqueline Fontenot. ECF No. 1. Plaintiff asserts claims for: (1) Sex and Race Discrimination/Creation of a Hostile Work Environment in violation of Title VII; (2) Retaliation and Creation of a Retaliatory Hostile Environment in violation of Title VII; (3) First Amendment Retaliation Pursuant to 42 U.S.C. § 1983; (4) *Monell* Claim Against Defendant Macomb County for First Amendment Violation; (5) Violation of the

Michigan Whistleblowers Protection Act; (6) Sex and Race Discrimination/Creation of a Hostile Work Environment in violation of the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"); (7) Retaliation and Creation of a Retaliatory Hostile Environment in violation of the Michigan ELCRA; and (8) Interference or Retaliation in Violation of the Federal Families First Corona Virus Response Act ("FFCRA").

Defendants Dr. Spitz and Spitz Pathology Group, PLLC filed a motion to dismiss Plaintiff's Complaint, arguing that Beaver's claims against them fail as a matter of law because they are not Beaver's joint employer. ECF No. 17. The Court denied that motion, finding that Beaver has plausibly pleaded sufficient facts to assert her claims against Spitz/SPG. ECF No. 29.

Following the close of discovery, Plaintiff filed a Motion for Partial Summary Judgment as to Defendants Macomb County and Patricia Roland. ECF No. 45. Macomb County and Roland filed separate response briefs in opposition. ECF Nos. 50, 51. Plaintiff filed separate reply briefs in support of her motion. ECF Nos. 55, 56.

Defendant Roland filed a Motion for Summary Judgment. ECF No. 44. Plaintiff filed a response in opposition. ECF No. 49. Roland did not file a reply brief.

The Macomb County Defendants filed a Motion for Partial Summary Judgment, ECF No. 46. Plaintiff filed a response in opposition. ECF No. 53. The Macomb County Defendants did not file a reply brief.

Finally, Defendants Spitz/SPG filed a Motion for Summary Judgment, ECF No. 47. Plaintiff filed a response in opposition. ECF No. 52. Spitz/SPG filed a reply brief in support of their motion. ECF No. 57.

## II.    LEGAL STANDARD

A party is entitled to summary judgment it if "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). No genuine material factual dispute exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At summary judgment, the Court construes the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in his favor. *Id.* The nonmoving party's evidence need not be in an admissible form. *Celotex v. Catrett*, 477 U.S. 317, 332 (1986). But he must "show that [he] *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).

## III. DISCUSSION

### A. Beaver's Hostile Work Environment Claim under Title VII against Defendant Macomb County (Count I)

Beaver brings her Title VII hostile work environment claim against Defendant Macomb County only, alleging that she was subjected to unwelcome communication and/or conduct on the basis of race and sex which was so severe and pervasive that it was intended to, and in fact did, substantially interfere with her job and/or create an intimidating, hostile, or offensive work environment. ECF No. 1, PageID.26–29.

Defendant Macomb County does not move for summary judgment on this claim. Macomb County also does not move for summary judgment on Beaver's hostile work environment claim under the Michigan ELCRA. That ELCRA claim will be addressed *infra*. Beaver, however, moves for partial summary judgment on this claim, arguing that Macomb County is judicially estopped from denying liability for the sexually hostile work environment at the MEO based on the arbitrator's finding that Roland was Beaver's supervisor and she knew of the pervasive hostile environment at the MEO.

To establish a prima facie claim of a sex-based hostile work environment under Title VII, a plaintiff must show: (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment unreasonably interfered with her work performance and created an objectively

31

intimidating, hostile, or offensive work environment; and (5) there is some basis for employer liability. *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021); *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009).

Beaver argues in her motion for partial summary judgment that she is entitled to summary judgment against Macomb County for the sexually hostile environment at the MEO as of May 26, 2020 under both Title VII and the ELCRA. ECF No. 45.[5] She argues that Macomb County is judicially estopped from denying liability for the sexually hostile work environment at the MEO because it "successfully proved all the elements necessary for Beaver's hostile environment claim at Roland's Arbitration." ECF No. 45, PageID.794–98.[6] Specifically, Beaver asserts that the County successfully proved at arbitration that (1) Beaver was a

---

[5]     Neither party specifically addresses Beaver's claims for a racially hostile work environment under Title VII or the ELCRA. Accordingly, those claims will not be dismissed.

[6]     "The doctrine of judicial estoppel protects the integrity of the judicial process by preventing a party from taking a position inconsistent with a position unequivocally and successfully asserted by the same party in another proceeding" and "[i]t is widely held that a position taken in arbitration can give rise to judicial estoppel." *Speroni S.p.A. v. Perceptron, Inc.*, 12 F. App'x 355, 358 & n.1 (6th Cir. 2001) (citing *Reynolds v. Comm'r of Internal Rev.*, 861 F.2d 469, 472 (6th Cir. 1988); *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982)); *see also PowerAgent Inc. v. Electronic Data Sys. Corp.*, 358 F.3d 1187, 1192–93 (9th Cir. 2004) (holding that prior statements made in administrative hearings or in arbitration proceedings are appropriate subjects of judicial estoppel in a subsequent court proceeding).

member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual environment created a hostile work environment; and (5) employer liability. *Id.*

In its Response, Macomb County admits that "[t]he County's investigation did determine that the atmosphere in the Medical Examiner's Office was a sexually hostile environment." ECF No. 51, PageID.2607. Macomb County disputes only the final element of Beaver's prima facie case—employer liability—arguing that it is not vicariously liable for the actions of Roland or others. The County asserts that no one had ever complained to it about the inappropriate screen savers and that the "Barry meme" and incident concerning the "penis cake" only occurred within the two months preceding Beaver's July 10, 2020 complaint email. *Id.* The County states that it has a discrimination and harassment policy in place and that its "swift response" to Beaver's July 2020 complaint reflects its commitment to enforcing that policy. Macomb County argues that there is a question of fact as to whether Beaver unreasonably failed to take advantage of the County's policy. Finally, Macomb County argues that "[i]t is still a question of fact whether there was an 'adverse employment action' taken against Plaintiff," and "[i]n the absence of such adverse employment action, there can be no vicarious liability for the County." *Id.* PageID.2608.

Here it is undisputed that Beaver, a female, belongs to a protected class and Defendant Macomb County concedes in its Response that she was subjected to unwelcome harassment and a sexually hostile work environment. Macomb County also admits in its Answer to the Complaint in this case that Hella, Stout, Parrent, and Defendant Roland subjected Beaver to "severe and pervasive sexual harassment by supervisors and co-employees." Macomb Defendants' Answer ¶ 170, ECF No. 14, PageID.150–51; *see also id.* ¶¶ 173, 225, PageID.151, 155 (admitting that Beaver "was subjected to unwelcome communication and/or conduct on the basis of sex and/or race."). The Court finds that this evidence satisfies the first four prongs of Beaver's prima facie claim of sexual harassment.

That leaves only whether there is a material disputed fact as to whether Macomb County is vicariously liable for the sexually hostile work environment based on the actions of Roland and "The Girls." The County argues that it had no notice of the screen savers, photos, and penis cake incident until Beaver complained on July 10, 2020, and that it promptly investigated and responded to that complaint, initially suspending and then terminating "The Girls" and Roland. The County asserts that Beaver thereafter never contacted HR with any complaints of a sexually or racially hostile work environment.

Beaver does not appear to dispute that Macomb County addressed her concerns regarding the sexually hostile work environment after she wrote her letter complaint on July 10, 2020. Indeed, Beaver states that

34

after Roland and "The Girls" were terminated, "[t]he sexually hostile environment was replaced by a retaliatory one created by Spitz/SPG and unremedied by the County." ECF No. 45, PageID.788. Beaver argues, however, that Macomb County nevertheless is liable for the pervasive co-worker harassment by "The Girls," allowed by her supervisor Roland, and is strictly liable for the hostile work environment created by County supervisors Roland and Spitz/SPG.

"Under Title VII, once a plaintiff establishes that they experienced a hostile work environment, [the Court] determine[s] an employer's liability for the harassing employee's conduct based on the status of the harasser." *Wyatt*, 999 F.3d at 412. As the Sixth Circuit explained:

> When the plaintiff's harasser is a co-worker, we apply a heightened negligence standard. *Vance v. Ball State Univ.*, 570 U.S. 421, 424, 133 S.Ct. 2434, 186 L.Ed.2d 565 (2013). However, if the harasser is a supervisor, we apply a more stringent standard. "If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Id*. But if the harassment does not result in a tangible employment action, "the employer may escape liability by establishing" an affirmative defense under the *Faragher-Ellerth* framework. *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

*Wyatt*, 999 F.3d at 412.

Beaver alleges that she was harassed by both her co-workers and her supervisor, and the record supports this.

### 1. Supervisor harassment

Beaver alleges that Macomb County is strictly liable for the hostile work environment created by her supervisors, Roland and Spitz/SPG. An employer is strictly liable for supervisor harassment if it results in a tangible adverse employment action to the employee, "such as discharge, demotion, or undesirable reassignment." *Ellerth*, 524 U.S. at 765. Macomb County argues that "[i]t is still a question of fact whether there was any 'adverse employment action' taken against" Beaver. ECF No. 51, PageID.2608. Beaver contends that she has suffered an "adverse employment action" when she was constructively discharged. However, this claimed constructive discharge occurred over eight months after Beaver complained of a sexually hostile work environment, and more importantly eight months after Roland was terminated. *See, e.g., Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 449 (6th Cir. 2020) (concluding "a roughly 75-day delay between her protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation."); *Cooper v. City of North Olmsted*, 795 F. 2d 1265, 1272 (6th Cir. 1986) (rejecting plaintiff's contention that temporal proximity of four months between the protected activity and adverse action was sufficient, on its own, to create an inference of retaliation).

Moreover, the Court finds that Beaver's claim of constructive discharge based on a hostile or retaliatory work environment fails in any event. "To establish a claim for constructive discharge, a plaintiff must

prove: (1) the employer *deliberately* created working conditions that a reasonable person would perceive as intolerable, (2) the employer did so to force the employee to quit, and (3) the employee quit." *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 373 (6th Cir. 2024). Thus, to prevail on such a claim, Beaver "must show deliberate harassing behavior sufficiently severe or pervasive to alter the conditions of [her] employment" and "that the abusive working environment became so intolerable that [her] resignation qualified as a fitting response." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 133–34 (2004). However, "intolerability is a demanding standard." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 815 (6th Cir. 2020) ("Our job is to confirm that the plaintiff's working conditions were hellish, or at least close to it."). "[T]he bar for proving constructive discharge is higher than that for a hostile work environment claim." *Cooper v. Jackson-Madison Cnty. Gen. Hosp. Dist.*, 742 F. Supp. 2d 941, 957 (W.D. Tenn. 2010). Factors relevant to intolerability include: (a) demotion; (b) reduction in salary; (c) reduction in job responsibilities; (d) reassignment to menial or degrading work; (e) reassignment to work under a younger supervisor; (f) badgering, harassment, or humiliation "by the employer calculated to encourage the employee's resignation;" (g) offers of early retirement or continued employment on terms less favorable than the employee's former status, *Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001)

(quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)); and (h) sexual assault. *Tchankpa*, 951 F.3d at 815.

Beaver cannot meet this "demanding standard." Beaver was not demoted; her salary was not reduced; her duties were not degraded or reassigned; she was never offered early retirement; she was not reassigned to work under a younger supervisor. She fails to show that her working environment became so intolerable that [her] resignation qualified as a fitting response." *Suders*, 542 U.S. at 133–34. The only factor that appears to be present is harassment. "[W]orkplace harassment that is severe and pervasive enough to create a hostile work environment *may* in some circumstances constructively discharge the employee." *Plautz v. Potter*, 156 F. App'x 812, 819 (6th Cir. 2005) (emphasis added). However, a "plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that a plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also." *See Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 682 (6th Cir. 2005) (citation omitted). Nothing in the record shows that Defendants harassed or humiliated Beaver in a manner "calculated to encourage [her] resignation." *Logon*, 259 F.3d at 571. And even if Beaver had demonstrated a fact issue on whether she was harassed in this calculated, deliberate manner to encourage her resignation, "[t]he occurrence of one" factor "in isolation generally is insufficient to support" a finding of intolerable working conditions to satisfy the first prong of the

constructive discharge inquiry. *Gosbin v. Jefferson Cnty. Comm'rs*, No. 2:14-CV-2640, 2017 WL 5653503, at *10 (S.D. Ohio Mar. 29, 2017), *aff'd*, 725 F. App'x 377 (6th Cir. 2018).

Further, Beaver admits that the sexually- and racially-charged hostile work environment at the MEO ended after she made her July 2020 complaint, and her primary complaint after that time pertained to alleged retaliation by Dr. Spitz. Beaver 40, 78, ECF No. 45-25, PageID.1783. Beaver does not allege any other "tangible adverse action." Beaver therefore fails to establish strict liability against Macomb County for supervisor harassment based on a tangible adverse employment action. *See Gallagher*, 567 F.3d at 275 (finding that the supervisor's participation in the harassment did not ripen into any tangible employment action against the plaintiff, such as firing or demotion, and thus the employer was not "ipso facto" vicariously liable).

But, even in the absence of such a tangible action, an employer may still be liable for a hostile work environment under Title VII created by its supervisors *unless* it successfully establishes as an affirmative defense "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* (citing *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807). This is known as the "*Faragher/Ellerth* affirmative defense."

"Generally, an employer satisfies the first part of this two-part test standard when it has promulgated and enforced a sexual harassment policy." *Gallagher*, 567 F.3d at 276. Macomb County presented evidence that it had a Discrimination and Harassment policy in place which provided that "The County prohibits harassment of any kind and will take appropriate and immediate action in response to complaints or knowledge of violation of this policy." ECF No. 46-6, PageID.2133. That policy further provides that "Employees who feel they have been victims of discrimination or harassment should bring such matters to the attention of their supervisor, Elected Official/Department Head or Human Resources and Labor Relations." *Id.* PageID.2134. Beaver did just that in her July 10, 2020 complaint letter.

Beaver contends that a "reasonable reporting policy" must require supervisors to report incidents of sexual harassment, citing *Clark v. UPS, Inc.*, 400 F.3d 341, 349 (6th Cir. 2005), and that Macomb County's policy did not include that requirement. In this regard, the Sixth Circuit has stated that:

> [A]n effective harassment policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy.

*Gallagher*, 567 F.3d at 275–76 (quoting *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008)). Beaver states that the County's policy

did not require supervisors like Roland, Terebesi, or Spitz/SPG to report incidents of sexual harassment, did not specify whether verbal complaints were sufficient, and did not provide a mechanism for bypassing Roland or Spitz/SPG, and thus it is unreasonable. ECF No. 56, PageID.2913. Macomb County argues that its policy is reasonable and provides an avenue for victims of harassment to decide who to make a complaint to. Indeed, as stated above, Beaver acknowledges that after she made the July 10, 2020 complaint, the sexually hostile working environment ended, and was replaced by a retaliatory environment. Beaver has clearly raised a genuine question of fact as to the reasonableness of the County's policy, and thus whether Macomb County is vicariously liable for supervisory harassment, but there are facts on both sides of the ledger as to the reasonableness and effectiveness of the County's policy.

Beaver therefore is not entitled to summary judgment on her sexually hostile work environment claims against Macomb County under Title VII (Count I) and that claim will go to the jury.

### 2. Co-worker harassment

Beaver's  claims are also based on alleged co-worker harassment. Beaver alleges that "The Girls" created a pervasive sexually hostile work environment which the County, Roland, and Spitz/SPG condoned rather than condemned. ECF No. 56, PageID.2910. "An employer is vicariously liable for co-worker harassment of which it knew or should have known

41

if it failed to take appropriate remedial action, i.e., if its response manifests indifference or unreasonableness." *Gallagher*, 567 F.3d at 276. "An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized—or is reasonably believed by a complaining employee to have been authorized—to receive and respond to or forward such complaints to management." *Id.* (citing *Bombaci v. Journal Cmty. Pub. Grp., Inc.*, 482 F.3d 979, 984 (7th Cir. 2007)). "[T]he plaintiff need not necessarily have reported [the co-worker] harassment to a supervisor" to establish that the employer "knew or should have known" of the co-worker harassment, and "[w]here harassment is pervasive, knowledge may be imputed to the employer." *Id.* (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999)).

The Macomb County Defendants admit that Hella, Stout, Parrent, and Defendant Roland subjected Beaver to "severe and pervasive sexual harassment by supervisors and co-employes." *See* Macomb Defendants' Answer ¶ 170, ECF No. 14, PageID.150-51; *see id.* ¶¶ 173, 225, PageID.151, 155 (admitting that Beaver "was subjected to unwelcome communication and/or conduct on the basis of sex and/or race"). Macomb County however asserts that *it* did not have knowledge of the hostile work environment at the MEO until Beaver formally complained in July 2020, and that it then promptly remedied that harassment.

42

Beaver has presented evidence that Roland was the Manager of Operations at the MEO during the relevant time period when Beaver alleges she was subjected to a sexually-hostile work environment, that Roland visited the Investigator's room up to 10 times a day, and that Roland witnessed and would have been aware of "The Girls'" offensive screen savers, penis confetti, "Barry meme," and "I am Moist" sign, etc. long before Beaver's July 2020 email complaint. Roland admits she was aware of the "penis cake" but states that she did not find it sexually explicit or offensive. Beaver also testified that she had previously complained to Terebesi in 2016 about the sexually hostile atmosphere at the MEO but that she "was strongly advised by Terebesi that any complaint would place [her] in danger and [her] employment was in jeopardy," Beaver 49–50, ECF No. 45-4, PageID.863. As stated above, Macomb County's Discrimination and Harassment Policy states that "Employees who feel they have been victims of discrimination or harassment should bring such matters to the attention of their supervisor, Elected Official/Department Head or Human Resources or Labor Relations." ECF No. 45-35, PageID.2083. Beaver testified that when she complained about the penis cake, the Barry meme, and the pornographic images in the investigator's room, Roland and others began increasingly scrutinizing and criticizing her work, taunting her, and talking negatively about her.

However, an employer's response to co-worker sexual harassment will only be actionable if it "manifests indifference or unreasonableness in light of the facts." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008). Thus, Beaver must still show that the County failed to take "appropriate remedial action" after it is deemed to have received such notice of the objectionable conduct. *See Gallagher*, 567 F.3d at 276. While Macomb County asserts it took prompt remedial action after Beaver submitted her July 10, 2020 complaint, the reasonableness of the response to Beaver's earlier complaints about the inappropriate conduct at the MEO is less clear. Whether that response was reasonable will depend on a number of facts such as what Beaver actually told Roland and others about the conduct and what responsibility Beaver had to report the conduct up the chain of command earlier, given Roland's alleged involvement in the harassing conduct. Thus, there is a question of fact as to whether the County's response, or lack of response, to Beaver's earlier complaints "manifest[ed] indifference or unreasonableness," *Gallagher*, 567 F.3d at 276, and thus whether the County is vicariously liable for the alleged co-worker harassment.

Accordingly, Beaver's motion for partial summary judgment against Macomb County on her Title VII Hostile Work Environment claim in Count I of her Complaint will be **DENIED**.

### B. Beaver's Retaliation/Retaliatory Hostile Environment Claim against Macomb County under Title VII (Count II)

Beaver brings her Title VII retaliation/retaliatory hostile environment claim against Defendant Macomb County only, alleging that Macomb County "through its agents and employees" retaliated against Beaver because she engaged in protected activity by "among other things, creating a retaliatory hostile environment, issuing her bogus disciplines, docking her pay, treating her differently from similarly situated employees, and intentionally engaging in other unlawful conduct which would deter a reasonable person of ordinary firmness from speaking out." ECF No. 1, PageID.29.

Macomb County moves for summary judgment on this claim, arguing that Beaver cannot show that the County, or any of the County actors, took a materially adverse action against her by administering "bogus" disciplines, denying overtime, docking her pay, or imposing unreasonable and oppressive working conditions. The County argues that these discrete acts do not constitute "materially adverse actions," ECF No. 46, PageID.2099–2106. Beaver responds that the County improperly focuses only on discrete acts and omits any reference to the retaliatory environment altogether. She argues that she was labelled a "troublemaker" after she and other employees repeatedly complained about the oppressive retaliatory environment at the MEO and that the

County failed to protect her from retaliatory harassment. ECF No. 53, PageID.2888–89.

To establish a prima facie case of retaliation and retaliatory harassment under Title VII, a plaintiff must prove that (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Wyatt*, 999 F.3d at 419–20. An adverse employment action in the retaliation context is conduct that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Davis v. Metro Parks & Recreation Dep't*, 854 F. App'x 707, 718 (6th Cir. 2021) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "How a reasonable worker reacts is an 'objective standard.'" *Id.* at 714. "This standard is phrased in general terms 'because the significance of any given act of retaliation will often depend upon the particular circumstances. *Context matters*." *Spence v. Donahoe*, 515 F. App'x 561, 572–73 (6th Cir. 2013) (emphasis added) (quoting *Burlington N.*, 548 U.S. at 69)).

When the alleged adverse employment action is a retaliatory hostile environment, as in this case, the Court must assess "the cumulative effect" of Defendants' actions "as if they 'constitute one unlawful

employment practice.'" *Davis*, 854 F. App'x at 718–19 (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). This is because "even where certain incidents alone may not rise to the level of being materially adverse employment actions, [the Sixth Circuit Court of Appeals] has found that multiple 'incidents taken together might dissuade a reasonable worker from making or supporting a discrimination charge.'" *Spence*, 515 F. App'x at 572–73 (citing *Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587, 599 (6th Cir. 2009)); *see also Henry v. Abbott Labs.*, 651 F. App'x 494, 504 (6th Cir. 2016) ("[E]ven when one employment action may not rise to the level of an adverse action, multiple incidents taken together might dissuade a reasonable worker from making or supporting a discrimination charge"). The Court evaluates all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," and whether the defendant's conduct "included repeated abusive discriminatory comments or treatment." *Davis*, 854 F. App'x at 718 (citations omitted).

Beaver claims that Macomb County created an abusive retaliatory work environment for her and other targeted morgue employees and retaliated against her for filing the July 10, 2020 complaint by (1) disciplining her, (2) docking her pay, (3) denying her overtime,

(4) denying her shift preferences, (5) intentionally delaying responding to her work calls, and that (6) Dr. Spitz displayed erratic behavior and would "glare and grunt" at her and increasingly scrutinize and critique her work, culminating in her constructive discharge on March 15, 2021. ECF No. 53, PageID.2888. She complains that these actions, considered as a totality of circumstances, constituted an abusive and hostile work environment. Although any one of these acts, considered alone, may or may not constitute a materially adverse action, considered cumulatively, the Court concludes that a reasonable jury could find that the workplace environment Beaver encountered after she filed her hostile work environment complaint "would have dissuaded a reasonable employee from making a charge of discrimination." *Davis*, 854 F. App'x at 719.

Beaver has presented evidence that Dr. Spitz was angry with Beaver, Acre, and Terebesi for their part in the County's investigation and termination of Roland and "The Girls" and that Macomb County employees were aware of Dr. Spitz's anger. McKinnon 78–79, 102–04, 133–34, ECF No. 45-10, PageID.1113 ("Dr. Spitz was very unhappy we terminated those four individuals."), 1120–21, 1128; Terebesi 101–02, ECF No. 45-13, PageID.1255–56. Beaver claims that "it was common knowledge that [Dr. Spitz] wanted us all gone." Beaver 48, ECF No. 45-25, PageID.1785. In fact, some time after Beaver complained about Roland and "The Girls," Dr. Spitz reported for the first time to McKinnon that Beaver "had not performed her duties appropriately and should be

disciplined." McKinnon 128–29, ECF No. 45-10, PageID.1127. Terebesi similarly testified that Dr. Spitz's criticisms of Beaver seemed to increase after her complaint about the sexually hostile work environment at the MEO, questioning her handling of investigations. Terebesi testified that she met weekly with Deputy County Executive Al Lorenzo and that she discussed Dr. Spitz's "difficult" behavior and the stress and tension in the office caused by Dr. Spitz because "he was still angry about what had happened" to Roland and "The Girls." Terebesi 38–40, 70–71, 100–02, 146–47, ECF No. 45-13, PageID.1238, 1240, 1255–56. Terebesi testified that Lorenzo would only respond that "we know how Dr. Spitz is." *Id.* 103, PageID.1256.

While the County contends that Beaver's claim of lost overtime fails to constitute a materially adverse action because it was de minimis, Fontenot testified that Dr. Spitz directed her to review Beaver's claimed overtime because he claimed it did not match "the times on his phone" and Terebesi testified that Dr. Spitz only asked about overtime submitted by Beaver and Acre. Fontenot further testified that "since I started [at the Macomb County MEO], I'm not aware of anyone else being denied overtime." Fontenot 63, ECF No. 45-19, PageID.1496. The evidence allows a reasonable inference that Dr. Spitz was focusing only on Beaver, the "troublemaker," and that she was being treated differently. Similarly, while the County argues that Beaver's written counseling memo for failing to advise Dr. Pietrangelo that a case was being brought into the

morgue was not a materially adverse action because it did not result in discipline, it was Dr. Spitz who brought the issue to Terebesi's attention, and Terebesi stated that this was the first time Dr. Spitz "ordered" her to prepare a written report like the counseling memo. Terebesi said that Acre was the only other employee she has issued a similar memo to, and that a different investigator did the same thing Beaver did and that investigator was not issued a written counseling memo. On a separate occasion, Dr. Spitz emailed Ridella requesting an investigation into an allegation that Beaver did not answer telephone calls from a hospice nurse; an allegation that turned out to be untrue, as the hospice nurse was mistakenly calling a different phone line. Again, this pattern appears to show differential treatment by Dr. Spitz targeting Beaver and Acre, the "complainers."

Beaver also contends that she was subjected to increased scrutiny, that Dr. Spitz refused to communicate with her, and that Dr. Spitz was "hostile" and "display[ed] erratic behavior," he grunts and makes weird noises as he walks past her, and he glares at her without saying anything and "glowers menacingly" at her. ECF No. 46-5; Beaver 116–28, ECF No. 45-4, PageID.880–82. In her deposition, Beaver complained Dr. Spitz would make "weird noises" at her and stand at the end of a row of desks with his hands on his hips and glare at her without saying anything and then walk away. *Id.* 117, 121, PageID.880–81. She complained that he delayed responding to her when she was on calls to interfere with her

50

ability to do her job in a timely and efficient manner and that he was openly hostile in work-related phone calls. She discussed one incident where he was argumentative and repeatedly criticized and questioned her use of the word "entanglement" to describe a death scene where Beaver described the decedent as "entangled" in her walker, and he repeatedly complained the photos she took were too blurry. *Id.* 124–28, PageID.881–82. She described his tone as "very curt" and aggravated. *Id.*

Beaver also states that Macomb County has similarly retaliated against other employees who complained about unfair and discriminatory treatment. Elgohail complained to Roland about "The Girls'" harassment of her that created a sexually-tainted work environment, and she was terminated within a month. Struckel was similarly terminated days after complaining about safety violations, with Dr. Spitz stating that "[w]e have no need for those who want to create problems and undermine the work that we do." ECF No. 52-6. Acre filed a complaint on behalf of all union members about the hostile and retaliatory work environment at the MEO by Dr. Spitz, stating "many of the employees feel they have [been] exposed to a hostile work environment or retaliation by Dr. Spitz," followed by a list of several examples of such retaliation. ECF No. 52-2 (stating that Dr. Spitz has said that "employees who no longer work for the county did nothing wrong and this was all a conspiracy made up by a few employees, ... show[ing] that certain employees are being blamed and therefore

targeted as retaliation."). The Court may consider this evidence of other acts of harassment or retaliation of which a plaintiff becomes aware during the period of her employment, "even if the other acts were directed at others and occurred outside the plaintiff's presence," because such evidence demonstrates that the plaintiff perceived the work environment was hostile to her. *Hawkins*, 517 F.3d at 335–36. Thus, these other acts constitute evidence that the environment was objectively hostile and that Beaver subjectively perceived severe or pervasive harassment at the MEO that would dissuade a reasonable person from bringing a charge of discrimination.

Viewing all this evidence in the light most favorable to Beaver, a reasonable jury could conclude that the cumulative effect of these actions over a relatively short period of time—less than one year, from August 2020 to March 2021—subjected Beaver to a workplace environment that might dissuade a reasonable worker from making a complaint of discrimination. *See Henry*, 651 F. App'x at 505; *Davis v. Metro. Gov't of Nashville & Davidson Cnty., Tenn*, No. 3:17-CV-00773, 2022 WL 860436, at *7–8 (M.D. Tenn. Mar. 33, 2022) (supervisor's telling plaintiff she might not last until she was eligible to retire, excluding plaintiff from the supervisor's open door policy, agreeing to meet with plaintiff only if another employee was present, giving low performance evaluations, and refusal to talk to plaintiff, considered together might dissuade a reasonable worker from making or supporting a charge of

discrimination). Beaver's "allegations must be assessed as if they 'constitute one unlawful employment practice.'" *Davis*, 854 F. App'x at 718–19 (quoting *National R.R. Passenger Corp.*, 536 U.S. at 117). As the Sixth Circuit has explained,  the standard for demonstrating an adverse employment action is not "demanding" and is a "relatively low bar" that is "not onerous." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007); *Henry*, 651 F. App'x at 504. Beaver has raised sufficient facts to meet that standard here and allow the jury to decide her retaliation claim against Macomb County.

Accordingly, the Court finds that Defendant Macomb County is not entitled to summary judgment on Beaver's Title VII Retaliatory Hostile Environment claim.

### C. First Amendment Retaliation Pursuant to 42 U.S.C. § 1983 Against Defendants Spitz/SPG, Fontenot, Ridella, and McKinnon (Count III) and *Monell* Claim Against Defendant Macomb County (Count IV)

Beaver alleges that Defendants Spitz/SPG, Fontenot, Ridella, and McKinnon retaliated against her in violation of her First Amendment Rights for speaking out on matters of significant public concern such as unlawful discrimination, retaliation, public health violations, and misuse of taxpayer funded equipment. She also claims that Macomb County had an illegal policy or custom of retaliating against and attempting to silence employees, like her, who exercised their First Amendment rights.

There are two elements to a § 1983 claim. First, a plaintiff must allege that a defendant acted under color of state law. Second, a plaintiff must allege that the defendant's conduct deprived the plaintiff of rights secured under federal law. *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 539 (6th Cir. 2012) (citing *Fritz v. Charter Twp. of Comstock,* 592 F.3d 718, 722 (6th Cir.2010)). To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, a plaintiff must establish that "(1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct." *Handy-Clay*, 695 F.3d at 539 (quoting *Fritz,* 592 F.3d at 723). Once the plaintiff has established a prima facie case, the burden of production shifts back to the defendant to show that he would have taken the same action in the absence of the protected activity. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010). If the defendant makes that showing, he is entitled to prevail on summary judgment. *Id.*

## 1. Spitz/SPG

In their motion for summary judgment, Defendants Spitz/SPG only contest the second prong of the prima facie case of Beaver's First Amendment retaliation claim—whether Beaver can establish an adverse action "that would deter a person of ordinary firmness from continuing

to engage in [constitutionally protected] conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

To establish an adverse action for First Amendment retaliation purposes, "a plaintiff must show that the action 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (quoting *Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007)). But "[i]t is not necessarily true ... that every action, no matter how small, is constitutionally cognizable" as an "adverse action." *Thaddeus-X*, 175 F.3d at 396. In the employment context, "[t]he term 'adverse action' has traditionally referred to actions such as discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012) (alteration omitted) (quoting *Handy-Clay*, 695 F.3d at 545). However, the Sixth Circuit has held that "any action that would deter a person of ordinary firmness from exercising protected conduct will suffice, which may include harassment or publicizing facts damaging to a person's reputation." *Fritz*, 592 F.3d at 724. "*Actual* deterrence need not be shown." *Harbin-Bey v. Rutter*, 420 F.3d 571, 579 (6th Cir. 2005) (emphasis in original).

"[T]his element is not an overly difficult one for the plaintiff to meet." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010). Consequently, "unless the claimed retaliatory action is truly inconsequential, the

plaintiff's claim should go to the jury." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002). Nevertheless, when a plaintiff's alleged adverse action is "inconsequential," resulting in nothing more than a "de minimis injury," the claim is properly dismissed as a matter of law. *Id.* at 603, 606; *see also Ingraham v. Wright*, 430 U.S. 651, 674 (1977) (recognizing that "[t]here is, of course, a de minimis level of imposition with which the constitution is concerned."). Indeed, it "trivialize[s] the First Amendment to allow plaintiffs to bring ... claims for *any* adverse action[,] no matter how minor." *Bell*, 308 F.3d at 603 (internal quotation marks and citation omitted) (emphasis in original). And, "since § 1983 is a tort statute, [the Court] must be careful to ensure that *real injury* is involved, lest we 'trivialize the First Amendment' by sanctioning a retaliation claim even if it is unlikely that the exercise of First Amendment rights was actually deterred." *Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005) (citations omitted and emphasis added).

Because the test is an objective one, " 'the issue is whether a person of ordinary firmness would be deterred, not whether the [plaintiff] h[er]self actually was deterred.'" *Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010) (citing *Harris v. Bornhorst*, 513 F.3d 503, 519 (6th Cir. 2008)). As with Beaver's retaliatory harassment claim above, viewing all the evidence in this case in the light most favorable to her, a reasonable jury could conclude that the cumulative effect of all the actions she complains of, over a relatively short period of time—August

2020 to March 2021—could deter a person of ordinary firmness from continuing to engage in constitutionally protected activity. *See Harper v. City of Cleveland*, 781 F. App'x 389, 396–97 (6th Cir. 2019) (employee's claims that supervisor "verbally disciplined" him and "attacked [him] verbally in Roll Call using obscenities, and threatened that [he] would never work [the supervisor's] shift again for overtime," being accused of sick-time abuse, causing damage to City property, and sleeping while on duty, and being transferred and then suspended constitute adverse actions for a First Amendment retaliation claim); *see also Feminist Majority Found. v. Hurley*, 911 F.3d 674, 697 n.12 (4th Cir. 2018) ("The standard for proving a materially adverse action in the Title VII retaliation context … is similar to the standard for demonstrating an adverse action in the First Amendment retaliation context."); *Rock v. Blaine*, No. 8:14-cv-01421, 2018 WL 1415202, at *14 (N.D.N.Y. Mar. 20, 2018) ("Defendant Blaine argues that Plaintiff cannot demonstrate that he took an adverse employment action against her. However, as previously discussed, the aggregate effect of Defendant Blaine's conduct is sufficient to sustain a retaliation claim under Title VII. Given that Title VII and First Amendment retaliation claims use the same standard for determining an adverse action, the Court rejects Defendant Blaine's argument.").

Accordingly, Spitz/SPG's motion for summary judgment on Beaver's First Amendment retaliation claim against them will be **DENIED**.

### 2. The individual County Defendants: Fontenot, Ridella, and McKinnon

A lawsuit may be brought against a county's officials for a county's alleged violation of an individual's rights under 42 U.S.C. § 1983. *See McGuire v. Ameritech Servs.*, 253 F. Supp. 2d 988, 1015 (S.D. Ohio 2003). However, an agency may be liable under § 1983 for its employees' unconstitutional conduct only where the agency *itself* caused the constitutional injury through a government policy or custom. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 694 (1978)).

The County Defendants argue in their motion for partial summary judgment that Macomb County, McKinnon, Ridella, and Fontenot, are not vicariously liable under § 1983 for alleged violations of Beaver's First Amendment rights, but these Defendants *only* address *Monell* liability, which claim pertains only to Defendant Macomb County. *See* ECF No. 46, PageID.2106–13; *see also* ECF No. 1, PageID.34–35. They do not separately address the individual Defendants' (Fontenot, Ridella, and McKinnon) liability for Beaver's First Amendment claim in Count III of her Complaint. Thus the Court finds that Fontenot, Ridella, and McKinnon have waived that argument.

But to the extent the Macomb County individual Defendants' motion could be read to argue that Fontenot, Ridella, and McKinnon are entitled to summary judgment against Beaver for her First Amendment retaliation claim under the same analysis offered by Spitz/SPG, their motion will be denied for the same reasons the Court gave in denying that motion.

### 3. Defendant Macomb County

Macomb County seeks summary judgment on Beaver's First Amendment *Monell* claim in Count IV of her Complaint.

A municipality cannot be liable under a theory of respondeat superior for the constitutional torts of its employees—"in other words, '*solely* because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (emphasis in original) (quoting. *Monell*, 436 U.S. at 691). Instead, municipal liability may be established either through an express municipal policy that deprives an individual of a constitutionally protected right, or by a "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)); *Monell*, 426 U.S. at 694. The "policy or custom" must be the "moving force" behind the deprivation of the plaintiff's rights. *Monell*, 436 U.S. at 694. An actionable custom—as opposed to a written policy—is one that

"has not received formal approval through ... official decisionmaking channels." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007). A plaintiff may establish the existence of a custom by showing that "policymaking officials knew about and acquiesced in the practice at issue." *Id.* (citing *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis,* 361 F.3d 898, 902 (6th Cir. 2004)); *see also Doe v. Claiborne Cnty.,* 103 F.3d 495, 507 (6th Cir. 1996) ("Under *Monell*, the [defendants] cannot be found liable unless the plaintiff can establish that an officially executed policy, *or the toleration of a custom* ... leads to, causes, or results in the deprivation of a constitutionally protected right.") (emphasis added). A plaintiff bears a heavy burden in establishing municipal liability. *Thomas v. City of Chattanooga,* 398 F.3d 426, 433 (6th Cir. 2005). Bald allegations of the existence of a policy or a failure to produce evidence of a pattern of similar activity are insufficient to survive summary judgment. *Aureus Holdings, Ltd. v. Detroit City,* 303 F. App'x 265, 270–71 (6th Cir. 2004).

Thus, to establish *Monell* liability against Macomb County, Beaver must show that a violation of her constitutional rights occurred because of a Macomb County policy or custom. *Monell*, 436 U.S. at 694. This showing can be made by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or

(4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess*, 735 F.3d at 478. Beaver must also identify a connection between the policy or custom and the *unconstitutional* conduct that led to her injury; the policy or custom must be the "moving force" behind the eventual constitutional violation. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).

Beaver argues that Macomb County had a policy, practice, or custom "to delegate its constitutional and statutory obligations owed to its employees to Spitz/SPG" and a policy, custom, and practice to retaliate against employes who exercised their First Amendment Free Speech [rights]." ECF No. 53, PageID.2891. Beaver also contends that the County failed to properly train supervisors in their statutory and constitutional duties" with respect to civil rights training. *Id.* PageID.2891–92. In support of her *Monell* claim, Beaver (1) points to Maia Elgohail's 2017 complaint that she was retaliated against for speaking out against discrimination and the EEOC's December 13, 2019 determination that there was reasonable cause to believe that Maia Elgohail was subjected to subjected to sexual harassment and retaliated against for filing a complaint of harassment; and (2) broadly asserts that "[t]he County knew the same with Robinette Struckel, Beaver, Acre and Terebesi, the latter of which spoke directly to Al Lorenzo about Spitz's

61

abuse." *Id.* Beaver also points to her own alleged experiences of retaliation.

The substantive bar for proving a municipal custom or practice is quite high. *See Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice."). To prevail on a widespread practice or custom claim, a plaintiff must show that similar unconstitutional acts have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010) (internal citations omitted). That is, a pattern requires "sufficiently numerous prior incidents," not "[i]solated instances." *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989); *see also Stone v. City of Grand Junction, Tenn.*, 765 F. Supp. 2d 1060, 1072 (W.D. Tenn. 2011) (stating that "three [alleged incidents] in an isolated period lasting less than two months … do not demonstrate that the City had a custom of permitting unconstitutional arrests for stalking 'so widespread, permanent, and well settled as to have the force of law' and that it was a 'deeply embedded traditional way[] of carrying out state policy."). A pattern also requires similarity and specificity; "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation

in question." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) (collecting cases).

Applying this settled law, Beaver has failed to demonstrate a persistent, widespread, and permanent custom or practice of First Amendment retaliation violations, and has instead only points to alleged isolated incidents.

That same reasoning applies to Beaver's failure-to-train claim. Beaver argues that the County failed to properly train supervisors in their statutory and constitutional duties. ECF No. 53, PageID.2891–92. She cites to Roland's testimony that she did not find the penis cake "explicit" or "offensive," and that Spitz/SPG admits not receiving any civil rights training from the County. *Id.* "[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *City of Canton v. Harris,* 489 U.S. 378, 387 (1989); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.") (citation omitted). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton*, 489 U.S. at 387. And "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of

his action." *Connick*, 563 U.S. at 61 (internal quotation marks omitted). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* (citation omitted). Or in limited circumstances, a plaintiff can establish deliberate indifference based on "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Plinton v. City of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quoting *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). This theory needs to be circumscribed because "in virtually every instance where a person has had his or her constitutional rights violated by a city employee, § 1983 plaintiffs will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton*, 489 U.S. at 392.

Beaver's alleged incidents are insufficient to establish a "pattern of similar constitutional violations" demonstrating that the County's training program was so deficient that it constituted a deliberate indifference to the rights of its employees or an "obvious potential" for constitutional violations on the part of the County.[7]

---

[7]    Although Beaver alleges in her Complaint that "an official with final decision-making authority (*i.e.*, Defendants McKinnon, Ridella and/or Spitz/SPG)" ratified the alleged unconstitutional acts, ECF No. 1, PageID.34–35, she fails to make that argument in her Response to the Macomb County Defendant's motion for summary judgment.

Accordingly, Macomb County's motion for summary judgment will be **GRANTED** on Beaver's *Monell* claim.

### D. Violation of Michigan's Whistleblower Protection Act (Count V)

Beaver alleges a claim against Defendants Macomb County, Ridella, McKinnon, Fontenot, and Spitz/SPG for violation of Michigan's Whistleblower Protection Act ("WPA"), MCL § 15.361, *et seq*., which provides:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

MCL § 15.362. "To establish a prima facie case under [the WPA], a plaintiff must show that (1) the plaintiff was engaged in a protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action." *West v. General Motors Corp.,* 665 N.W.2d 468, 471–72 (Mich. 2003) (citing *Chandler v. Dowell Schlumberger, Inc.,* 572 N.W.2d 210, 212 (Mich. 1998)). Once the plaintiff has proved a *prima facie* case, the defendant

then must articulate a legitimate business reason for the plaintiff's discharge. *Shaw v. Ecorse,* 770 N.W.2d 31, 37 (Mich. App. 2009). If the defendant is able to articulate such a reason, the plaintiff bears the burden of showing that the defendant's reason was merely pretextual. *Id.* at 37; *Eckstein v. Kuhn,* 408 N.W.2d 131, 134 (Mich. App. 1987).

Beaver states she filed a MIOSHA complaint on November 18, 2020 alleging that the County failed to provide adequate PPE at the scenes of a death, and that Defendants County, Spitz/SPG, McKinnon, and Fontenot knew of this protected activity. *See* ECF No. 52-9; ECF No. 46-17 (notice of anonymous complaint to MEO dated December 2, 2020). She states that a MIOSHSA inspector appeared at the MEO to inspect the vehicles used by the investigators. At the end of the inspection the agent did not require any changes and made no comments concerning the PPEs. On February 18, 2021, MIOSHA entered its final report stating that the inspection resulted in four citations, all of which were marked "Corrected During Inspection," and a fine of $6,300, which was subsequently reduced to $3,150. ECF No. 52-10, PageID.2800–09, 2809–17.[8] Beaver contends

---

[8]     As noted *supra*, it is not clear whether this MIOSHA notification is associated, at least in part, with the separate, earlier complaint filed by Struckel. The MIOSHA report states that MIOSHA began an investigation at the MEO on October 14, 2020, and that the report relates to inspection dates of October 14, 2020 through January 14, 2021. *Id.* PageID.2809, 2811. Beaver's MIOSHA complaint was not filed until November 18, 2020, ECF No. 52-9, *after* the MIOSHA inspection had already been initiated.

that the Defendants constructively discharged her in retaliation for her protected activity.

The Defendants do not dispute that Beaver engaged in protected activity under the WPA when she filed her MIOSHA complaint. Rather, they argue that she has failed to meet the second prong of her prima facie case—to establish that Defendants took an adverse action against her for filing the MIOSHA complaint. ECF No. 46, PageID.2113–14; ECF No. 47, PageID.2302–03.[9] The WPA states that an employer shall not "discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment." MCL § 15.362. "[T]he action must be materially adverse in that it is more than 'mere inconvenience or an alteration of job responsibilities.'" *Wilcoxon v. Minn. Mining & Mfg. Co.*, 597 N.W.2d 250, 258 (Mich. App. 1999). Although an exhaustive list does not exist, "typical" adverse employment actions under the WPA include: "a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Dorchy v. Fifth Third Bank*,

---

[9]     Spitz/SPG also argues that it is not liable under the WPA, which is expressly limited to "employers" because it is not Beaver's employer. ECF No. 47, PageID.2303. Because the Court finds that Beaver fails to meet the second prong of her prima facie WPA retaliation claim, it need not address this argument.

585 F. Supp. 3d 1021, 1024–25 (E.D. Mich. 2021) (Ludington, J.) (quoting *Peña v. Ingham Cnty. Rd. Comm'n*, 660 N.W.2d 351, 358 (Mich. App. 2003) (citations omitted).

As stated above, Beaver has not established that she was constructively discharged. She has not alleged that she was demoted, that her wages were decreased, that she lost benefits or experienced significantly diminished material responsibilities, or that Defendants otherwise threatened her following her MIOSHA complaint, and her remaining complaints fail to meet the materially adverse requirement of the WPA. *See Dorchy*, 585 F. Supp. 3d at 1024–25. Beaver therefore cannot meet her burden to show she suffered an adverse action under the WPA against any Defendant, and that claim will be **DISMISSED**.

### E. Violation of Michigan ELCRA Sex and Race Discrimination and/or Hostile Work Environment Claim Based on Sex and Race Against All Defendants (Count VI)

Beaver alleges a hostile work environment claim based on sex and race under the Michigan ELCRA against all Defendants. *Id.* PageID.37–40. The analysis of hostile work environment claims under the ELCRA is "identical" to the Title VII analysis. *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012).

#### 1. The Macomb County Defendants

Defendant Macomb County does not move for summary judgment on this claim. See ECF No. 46. However, it argues in its Response to Plaintiff's Motion for Partial Summary Judgment that it is entitled to a

defense of vicarious liability to Beaver's Title VII and ELCRA hostile work environment claims, asserting that its "swift response" to Beaver's complaint of a sexually charged hostile work environment pursuant to its policy defeats Beaver's claim. ECF No. 51. As discussed *supra*, the Court finds that there is a question of fact as to whether Macomb County is vicariously liable to Beaver under Title VII for coworker or supervisor harassment. The ELCRA, however, differs from Title VII as to the standard for imposing vicarious liability on the employer for the acts of its employees. *See Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 916 (Mich. 2000). Under the ELCRA "an employer may avoid liability [in a hostile environment case] 'if it adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment,'" *id.* (citation omitted), and this applies "if the plaintiff accuses either a co-worker, or a supervisor of sexual harassment.'" *Id.* (internal and end citation omitted). A plaintiff can show notice through proof of actual notice or constructive notice. *Id.* at 919. For the reasons stated *supra*, there is a triable issue of fact as to whether Macomb County had actual or constructive notice of the harassment but failed to take appropriate remedial action at that time. Accordingly, Macomb County is not entitled to summary judgment on Beaver's ELCRA hostile work environment claim.

As to the individual Macomb County Defendants, while Defendants McKinnon, Ridella, and Fontenot summarily conclude at the end of their

motion for summary judgment that Beaver's hostile work environment claim under the ELCRA should be dismissed against them, *see* ECF No. 46, PageID.2115, they fail to provide any specific argument in their Motion for Partial Summary Judgment as to why they are entitled to summary judgment on this claim. *See* ECF No. 46. "[I]t is not for the court to search the record and construct arguments. Parties must do that for themselves." *Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017) (declining to consider party's arguments when it left "it to the court to seek out the relevant law, identify the relevant evidence, and develop their argument for them"). "Where a party fails to explain an argument and supply authority ... a court need not attempt to supply the missing information." *Lyngaas v. Curaden AG*, No. 17-10910, 2021 WL 6049428, at *3 (E.D. Mich. Dec. 21, 2021) (Goldsmith, J.). Accordingly, this argument has been waived; Defendants McKinnon, Ridella, and Fontenot are not entitled to summary judgment on this claim. *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted); *see also Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.").

## 2. Defendant Roland

Beaver moves for summary judgment on her ELCRA sexually hostile work environment claim against Roland, arguing that Roland is collaterally estopped from relitigating issues resolved in binding arbitration. ECF No. 45, PageID.799–800. Defendant Roland also moves for summary judgment on Beaver's hostile work environment claim under the ELCRAThe Michigan Court of Appeals further clarified that "[t]he issue is not whether the harassing acts were within the scope of the agent's authority.... The issue is whether the harasser was an agent, one vested with supervisory power and authority, at the time the harassing acts were being perpetrated against the victim." *Id.* at 459. In other words, the Court concluded, "[a]n agent can be held directly and individually liable if he engaged in discriminatory behavior in violation of the [EL]CRA while acting in his capacity as the victim's employer." *Id.* at 461. Accordingly, Roland's argument that there is no individual liability under the ELCRA must be rejected and her Motion for Summary Judgment **DENIED**. Roland does not otherwise contest her liability for Beaver's ELCRA hostile work environment claim in her motion.

To establish a *prima facie* case of hostile work environment under the ELCRA, Beaver is required to present evidence that: (1) she belonged

---

[10]   [11]   Under federal law, the elements, while stated differently, are substantially the same: (1) the issue in the subsequent litigation is

to a protected group; (2) she was subjected to communication or conduct on the basis of sex; (3) she was subjected to unwelcome sexual conduct or communication; (4) the unwelcome conduct or communication was intended to or did substantially interfere with her employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior. *Haynie v. State,* 664 N.W.2d 129, 133 (Mich. 2003); *Chambers,* 614 N.W.2d at 915. The last element requires proof that the employer "had either actual or constructive notice of the hostile work environment and failed to take prompt and remedial action." *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 474 (6th Cir. 2020) (citing *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 470–71 (6th Cir. 2009)) (additional citations omitted). Actual notice is established by showing that the harassment was reported to "higher management"—meaning "someone in the employer's chain of command who possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the offensive employee." *Id.* (quoting *Sheridan v. Forest Hills Pub. Schs.*, 637 N.W.2d 536, 542–43 (Mich. App. 2001)). Constructive

───────────────

identical to that resolved in the earlier litigation, (2) the issue was actually litigated and decided in the prior action, (3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation, (4) the party to be estopped was a party to the prior litigation (or in privity with such a party), and (5) the party to be estopped had a full and fair opportunity to litigate the issue. *Hammer v. I.N.S.*, 195 F.3d 836, 840 (6th Cir. 1999).

notice can be shown where "the harassment was so pervasive as to warrant an inference that the employer had actual knowledge or to charge the employer with constructive knowledge." *Id.* (citing *Sheridan*, 637 N.W.2d at 542).

Roland does not address any of the elements of a prima facie case in her motion. However, as discussed *supra*, Beaver has presented evidence to meet her prima facie burden. Roland concedes that she can be considered Beaver's supervisor during the relevant time period, ECF No. 44-1, PageID.620, and Accordingly, Roland's motion for summary judgment on Beaver's hostile work environment claim in Count VI of her Complaint will be **DENIED**.

Initially, the Court notes that whether to apply federal or Michigan law to evaluate the preclusive effect of an arbitration proceeding is "less than clear." *W.J. O'Neil Co. v. Shepley, Bulfinch, Richardson & Abbott, Inc.*, 700 F. App'x 484, 489–90 (6th Cir. 2017); *see also Tankersley v. Lynch*, No. 11-12847, 2012 WL 683384, at *6 (E.D. Mich. Mar. 2, 2012) (Battani, J.) ("The source of the law that governs the preclusion consequences of an arbitration award has not been much developed.") (punctuation modified). Federal courts apply federal law in determining the preclusive effect of a prior federal judgment; they apply state law when determining the preclusive effect of a prior state court judgment. *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 650 (6th Cir. 2007). But neither of these rules directly applies to the situation at hand.

However, both parties analyze this issue under Michigan law, so the Court will do the same. *See W.J. O'Neil Co.*, 700 F. App'x at 490 ("But because neither party briefs the issue adequately nor disputes the application of Michigan law, we will follow the parties' lead and apply Michigan law."). Under Michigan law, "[c]ollateral estoppel precludes relitigation of an issue in a subsequent, different cause of action between the same parties when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in that prior proceeding." *Radwan v. Ameriprise Ins. Co.*, 933 N.W.2d 385, 389 (Mich. App. 2018) (citation omitted). The three elements of collateral estoppel are: (1) a question of fact essential to the judgment was actually litigated and determined by a valid and final judgment; (2) the same parties or their privies had a full and fair opportunity to litigate the issues; and, (3) there was mutuality of estoppel. *Id.*[11]

---

[11]     Under federal law, the elements, while stated differently, are substantially the same: (1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation, (2) the issue was actually litigated and decided in the prior action, (3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation, (4) the party to be estopped was a party to the prior litigation (or in privity with such a party), and (5) the party to be estopped had a full and fair opportunity to litigate the issue. *Hammer v. I.N.S.*, 195 F.3d 836, 840 (6th Cir. 1999).

### 3.   Spitz/SPG

Spitz/SPG move for summary judgment on Beaver's ELCRA hostile work environment claim. Spitz/SPG argues it is not an "employer" as defined by the ELCRA, that Beaver does not complain of severe and pervasive conduct that affected her work performance, and that Beaver did not complain to Spitz/SPG about such conduct. ECF No. 47, PageID.2300–01, 2303–04.

Beaver argues in response that she has presented evidence that Spitz is an employer under the ELCRA and has presented evidence sufficient to support her hostile work environment claim. ECF No. 52.

As discussed above, the ELCRA allows for individual liability. Dr. Spitz disputes that he had authority regarding personnel decisions over Beaver. He argues that he does not have the authority to discipline Beaver or effect a significant change in Beaver's employment status, and that she was employed by Macomb County, while Dr. Spitz is employed by SPG. Beaver argues that under the ELCRA, "it is through th[e] delegation of general supervisory power and authority that one becomes

---

12   The Sixth Circuit did observe in *Becton* that a court "may consider the arbitration decision as persuasive evidence that the grounds found by the arbitrator to be just cause for discharge under the collective bargaining agreement are sufficient to amount to just cause." 687 F.2d at 142. Moreover, "an arbitration decision in favor of the employer is sufficient to carry the employer's burden of articulating 'some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973)). *See also Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 549 (6th Cir. 2008).

an 'agent' of the employing entity and thus, an employer within the context of the [EL]CRA.'" ECF No. 52, PageID.2630 (quoting *Elezovich*, 731 N.W.2d at 458). Beaver asserts that it is undisputed that the County granted Spitz/SPG "general supervisory authority" over morgue staff, including making recommendations or providing input on hiring, firing, and discipline. *See* ECF No. 1-2, PageID.49–52; ECF No. 45-8, PageID.1013, 1021, 1035.

The Court finds on this record that there is a genuine issue of material fact regarding the question of whether Spitz/SPG is Beaver's employer for purposes of considering Beaver's hostile work environment claim under the ELCRA. As discussed above, under ELCRA, "persons to whom an employing entity delegates supervisory power and authority to act on its behalf are 'agents,' as distinguished from coemployees, subordinates, or coworkers who do not have supervisory powers or authority," and such agents are subject to ELCRA liability. *Elezovic*, 731 N.W.2d at 458. "[I]t is not necessary for a plaintiff to establish that a defendant was 'functioning as an agent' when he committed the charged specific acts of sexual harassment charged." *Id.* at 459. Agents of an employer are held to the same standard as the employer under ELCRA because when an employer's agent, who has control over the employee's "employment circumstances and opportunities like promotions, bonuses, overtime options, raises, shift and job assignments, and terminations," subjects an employee to sexual harassment, the employee is placed in the

same "no-win situation of either risking her livelihood by reacting to or reporting the unlawful behavior or accepting the harassment." *Id.* Viewed in the light most favorable to Beaver, a jury could conclude that Macomb County granted Dr. Spitz  supervisory authority over Beaver's employment. *See Doe v. Grand Co., LLC*, No. 18-13123, 2020 WL 806031, at *13–14 (E.D. Mich. Feb. 18, 2020) (Borman, J.) (finding disputed issues of fact as to whether individuals were "agents" under the ELCRA).

Spitz/SPG also rather summarily contends that Beaver's hostile work environment claim should be dismissed because she "complains of conduct that was neither severe nor pervasive, there is no evidence that it affected her work performance, and she never complained to Defendants about it." ECF No. 47, PageID.2303–04. They do not further discuss the facts of this case in support of this argument, and the single unpublished case they cite, *McGowen v. Kroger Dist. 1*, No. 16-13216, 2018 WL 6174042 (E.D. Mich. Sept. 7, 2018) (Whalen, M.J.) is not compelling under the facts of this case.[13] In *McGowen*, the three plaintiffs

---

[13]    Spitz/SPG argues in its Reply brief that Beaver's Response relies heavily on inadmissible hearsay, in the form of unsworn statements contained in the HRA Report, emails, and "timelines" prepared by Beaver. ECF No. 57, PageID.2919–20. Spitz/SPG argues that the HRA report is not a public report admissible under Federal Rule of Evidence 803(8). Courts have held that similar investigative reports, made at or near the time of the investigation, are admissible as a business record. *See Nemeth v. Citizens Fin. Grp.*, 08-cv-15326, 2012 WL 13198096, at *4 (E.D. Mich. Aug. 13, 2012) (Borman, J.) (investigative file including

alleged claims for sexual harassment and retaliation, complaining that over a period of 18 to 24 months they overheard some coworkers make inappropriate sex-related comments, a departmental mailbox had the words "cock block" written on it, someone drew a penis on the schedule in the break room and on wrapping paper, and one plaintiff was called a "bitch" and a "crack whore." 2018 WL 6174042, at *2–4. The court found that while these allegations "may have reflected a Junior High School mentality among some of the store employees, and while the Plaintiffs were understandably offended, they have offered no evidence that it was gender-based, or so pervasive as to affect the conditions of their employment." *Id.* at *7. *McGowen* is not controlling.

In this case, and as discussed *supra*, Beaver has presented evidence that pornographic images of males and naked, black male genitalia, including a pornographic photo known as the "Barry meme" were on several computer screen savers, and on sticky notes and ballons. Other screen savers contained offensive sexual words and phrases such as "cunt," "bitch," "Vagina," "anal fisting," "Fuck Bitches. Get Money," "Suck

---

written employee statements admissible as business record under Rule 803(6)) (collecting cases); *but see Downing v. Astrazeneca Pharm. LP*, No. 3:22-cv-00447, 2024 WL 3697018, at *5 (M.D. Tenn. Aug. 7, 2024) (stating "[t]he Sixth Circuit has held that investigative findings, including witness statements gathered by an employer during an internal investigation are properly considered at summary judgment and do not constitute hearsay as long as the findings and statements are offered 'not to prove their truth but to demonstrate the state of mind and motive of Defendant's managers in discharging Plaintiff.") (citation omitted).

my Dick," "You're a cunt," "Anal beads," and "I suck dick for money." "The Girls" also made drawings of penises and distributed confetti in the shape of male genitalia, and there was also a picture of a large woman with the caption "I am moist" posted in the office. And then a black penis cake was brought into the MEO, with the knowledge of Roland and Dr. Spitz.

Viewing the totality of this evidence in the light most favorable to Beaver, a question of fact readily exists as to whether this conduct was sufficiently severe or pervasive to constitute a hostile work environment. The inquiry into whether a working environment is hostile is not subject to a "mathematically precise test," *Harris v. Forklift Sys.,* 510 U.S. 17, 22 (1993), and there is no bright line "'between a merely unpleasant working environment ... and a hostile or deeply repugnant one,'" *McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir.2004) (citation omitted). Moreover, a working environment need not be "hellish" to establish a claim; "something short of the Ninth Ring" may violate anti-harassment statutes. *Jackson v. Cnty. of Racine,* 474 F.3d 493, 500 (7th Cir.2007). As the Supreme Court has stated:

> Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work

environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

*Harris,* 510 U.S. at 21.

"[W]hether harassment was so severe and pervasive as to constitute a hostile work environment [is] 'quintessentially a question of fact.'" *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016) (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)). The Court is to consider "harassment by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a hostile work environment." *Williams v. CSX Transp. Co.,* 533 F. App'x 637, 641 (6th Cir.2013) (quoting *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 562 (6th Cir. 1999)). The Court concludes that Beaver describes events, when considered as a whole and in the light most favorable to her, that create an issue of fact for a jury to decide whether she experienced a hostile work environment based on sex. *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016). Accordingly, Spitz/SPG's motion for summary judgment on Beaver's ELCRA hostile work environment claim is **DENIED**.

### F. Retaliation/Retaliatory Hostile Work Environment Claim under Michigan ELCRA Against Defendants Macomb County, McKinnon, Ridella, Fontenot, and Spitz/SPG (Count VII)

Defendant Macomb County does not move for summary judgment on Beaver's retaliation/retaliatory hostile work environment claim under

the ELCRA. However, Defendants McKinnon, Ridella, Fontenot, and Spitz/SPG do move for summary judgment on this claim.

"Michigan courts use the federal Title VII framework to assess retaliation claims." *Mumm v. Charter Township of Superior*, 727 F. App'x 110, 114 (6th Cir. 2018) The elements of a prima facie claim of retaliation/retaliatory harassment under Title VII and the ELCRA are : 1) that plaintiff engaged in an activity protected the ELCRA; 2) that the defendant knew of this exercise of plaintiff's protected rights; 3) that defendant consequently took an employment action adverse to plaintiff; and 4) that there is a causal connection between the protected activity and the adverse employment action. *Amini v. Rite Aid Corp.*, 819 F. App'x 344, 350 (6th Cir. 2020) (addressing a retaliatory harassment claim under the ELCRA); *see Meyer v. City of Center Line*, 619 N.W.2d 182, 189 (Mich. App. 2000) (retaliatory harassment can constitute an adverse action). Once a *prima facie* retaliation claim is established, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action. *Spengler v. Worthington Cylinders,* 615 F.3d 481, 492 (6th Cir. 2010). The burden then shifts back to the plaintiff to show the stated reasons were mere pretext to mask retaliation. *Id.*

The Court finds, for the same reasons stated *supra* that Beaver's Title VII retaliation/retaliatory hostile environment claim against Macomb County survives, her ELCRA retaliation/retaliatory hostile environment claim survives. Defendants McKinnon, Ridella, Fontenot,

and Spitz/SPG are not entitled to summary judgment on this claim, and their motions for summary judgment on this claim will be **DENIED**. *See Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 614 (6th Cir. 2019) ("The analysis of a retaliation claim brought under the ELCRA 'is identical to the Title VII analysis.'"); *Key v. City of Detroit*, 732 F. Supp. 3d 721, 735 (E.D. Mich. 2024) (DeClercq, J.) ("Th[e] same [burden-shifting] framework applies to retaliation claims brought under both Title VII and the ELCRA.") (citing *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004)).

### G. FFCRA Interference and Retaliation Claim Against Macomb County (Count VIII)

On March 18, 2020, Congress enacted the Families First Coronavirus Response Act ("FFCRA") in response to the emergent COVID-19 pandemic. *See* Pub. L. No. 116-127, 134 Stat. 178 [hereinafter "FFCRA"]; Paid Leave Under the FFCRA, 29 C.F.R. Part 826. One of the major provisions of the FFCRA was the Emergency Family and Medical Leave Expansion Act, or EFMLEA. *See* FFCRA §§ 3101 *et seq.* The EFMLEA temporarily amended Title I of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, to permit certain employees to take up to twelve weeks of expanded leave for reasons related to the coronavirus outbreak. FFCRA § 3102(a); *see also* 29 U.S.C. § 2612(a)(1)(F). More specifically, the EFMLEA expanded protected leave to employees who were unable to work or telework because their child's

82

school or place of care closed due to COVID-19, or their childcare provider was unavailable due to the same. FFCRA § 3102(b); *see also* 29 U.S.C. § 2620(a)(2). This provision is not at issue in this case because Beaver does not allege that she took leave to care for a child because that child's care provider was unavailable due to the COVID-19 pandemic.

The second major provision of the FFCRA was the Emergency Paid Sick Leave Act ("EPSLA"), which was enforced through the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* Under the EPSLA, "[a]n employer shall provide to each employee employed by the employer paid sick time to the extent that the employee is unable to work (or telework) due to a need for leave because: ... (2) [t]he employee has been advised by a health care provider to self-quarantine due to concerns related to COVID-19." EPSLA § 5102(a), 134 Stat. at 195 "The EPSLA prohibits employers from retaliating against employees for taking sick leave due a qualifying COVID-19-related condition." *Wadley v. Nat'l Ry. Equip. Co.*, 572 F. Supp. 3d 361, 370 (W.D. Ky. 2021) (citing 29 U.S.C. §§ 5102 and 5110(2)). "Enforcement of EPSLA claims falls under the provisions of the [FLSA]." *Kovacevic v. Am. Int'l Foods*, No. 22-1675, 2023 WL 3756063, at *4 (6th Cir. June 1, 2023) (citing 29 U.S.C. § 5105(a)(1)). "And we use the *McDonnell Douglas* framework to evaluate FLSA claims involving indirect evidence of retaliation," such as alleged in this case. *Id.* (citing cases).

Under this framework, Beaver must first meet the initial burden of establishing a prima facie case of retaliation. To establish a prima facie case of retaliation, an employee must show that: "(1) [she] was engaged in an activity protected by the [EPSLA];" (2) "the employer knew that [she] was exercising [her] rights under the [EPSLA];" (3) "after learning of the employee's exercise of [EPSLA] rights, the employer took an employment action adverse to [her];" and (4) "there was a causal connection between the protected [EPSLA] activity and the adverse employment action." *Wadley*, 572 F. Supp. 3d at 370 (quoting *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)). If Beaver establishes a prima facie case, the burden shifts to Macomb County to articulate some legitimate, nondiscriminatory reason for its actions. If Macomb County meets this burden, the burden shifts back to Beaver to demonstrate that Macomb County's explanation was pretextual, *i.e.*, that the "'proffered reasons [for terminating her] were factually untrue.'" *Kovacevic*, 2023 WL 37576063, at *5 (quoting *Lindsay v. Yates*, 578 F.3d 407, 421, 422 (6th Cir. 2009) (alteration in original)). Plaintiffs typically show pretext by demonstrating "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012).

Beaver complains that 20 hours were deducted from her sick-time bank because she was out sick with COVID-19 in November 2020, and that $300.00 was deducted from her paycheck from federal COVID-19 related funds she received. Assuming, without deciding, that Beaver can establish her prima facie case, Macomb County has proffered a legitimate, nondiscriminatory reason for its actions. Macomb County explains that, at the inception of the COVID-19 pandemic, Macomb County added an additional 75 hours of sick time employees could use for COVID-related time off. Szmatula Aff. ¶ 3, ECF No. 46-12, PageID.2167. With the passage of the federal EPSLA, an additional 80 hours were provided to employees for COVID-related time off. *Id.* As required by the law, Macomb County posted notice of these benefits *Id.* ¶ 4; ECF No. 46-11. Under the County's policy, employees were required to use the 75 County sick-time hours *before* the 80 federal COVID hours. Szmatula Aff. ¶ 5, ECF No. 46-12, PageID.2167. Szmatula's audit of all Medical Examiner's Office employees revealed that both Acre and Beaver were the only two employees whose hours needed to be adjusted, i.e. the COVIDFED hours were replaced by the COVID19 County hours. *Id.* ¶ 7. Beaver retained the COVIDFED hours to be used in the future and her leave banks reflected the County COVID19 hours were used instead. *Id.* ¶ 8, PageID.2168.

The County further explained that it provided a $5.00 "gratuity" payment for all hours employees worked in the office during COVID. *Id.*

85

¶ 6, PageID.2167. This gratuity payment was not available for hours worked remotely or while on leave. *Id.* Beaver had received this gratuity payment for time she was on leave, and thus she received an overpayment. *Id.* ¶¶ 7, 9, PageID.2167–68. The County provided Beaver the paperwork to support the actions taken with regard to her pay. *Id.* PageID.2170–76; ECF No. 46-13.

The Court finds that Macomb County has thus provided a legitimate, non-discriminatory reason for this employment action. Beaver did not respond to this argument, much less show that it was a pretext for retaliation. Accordingly, her FFCRA retaliation claim fails, and Macomb County is entitled to summary judgment on this claim.

## IV.   CONCLUSION

For the reasons stated above, the Court will (1) **DENY** Defendant Patricia Roland's Motion for Summary Judgment, ECF No. 44; (2) **DENY** Plaintiff Beaver's Motion for Partial Summary Judgment, ECF No. 45; (3) **GRANT IN PART AND DENY IN PART** Macomb County Defendants' Motion for Partial Summary Judgment, ECF No. 46; and (4) **GRANT IN PART AND DENY IN PART** Spitz/SPG Defendants' Motion for Summary Judgment.

Specifically,

As to Count I (Title VII—Race and Sex Hostile Work Environment) against Macomb County, Plaintiff's Motion for Partial Summary Judgment is **DENIED**; this claim will **PROCEED**;

As to Count II (Title VII—Retaliation/Retaliatory Hostile Environment) against Macomb County, Defendant Macomb County's Motion for Summary Judgment is **DENIED**; this claim will **PROCEED**;

As to Count III (First Amendment Retaliation) against Spitz/SPG and the Individual Macomb County Defendants, Defendant Spitz/SPG's and the Individual Macomb County Defendants' Motions for Summary Judgment are **DENIED**; this claim will **PROCEED;**

As to Count IV (First Amendment *Monell* Claim) against Macomb County, Defendant Macomb County's Motion for Summary Judgment will be **GRANTED**; this claim is hereby **DISMISSED**;

As to Count V (Michigan Whistleblowers Protection Act) against Spitz/SPG and the Macomb County Defendants, Defendant Spitz/SPG's and the Macomb County Defendants' Motions for Summary Judgment are **GRANTED**; this claim is hereby  will be **DISMISSED**;

As to Count VI (ELCRA—Race and Sex Hostile Work Environment) against ALL Defendants, the Motions for Summary Judgment by Plaintiff, Defendants Roland, Spitz/SPG, and the Macomb County Defendants are **DENIED**; this claim will **PROCEED**;

As to Count VII (ELCRA—Retaliation/Retaliatory Hostile Environment) against Spitz/SPG and the Macomb County Defendants, Defendant Spitz/SPG's and the Macomb County Defendants' Motions for Summary Judgment are **DENIED**; this claim will **PROCEED;** and;

As to Count VIII (FFCRA) against Macomb County, Defendant Macomb County's Motion for Summary Judgment will be **GRANTED**; this claim is hereby **DISMISSED**.

This is not a final order and does not close the case.

**IT IS SO ORDERED.**

Dated: March 31, 2025          /s/Terrence G. Berg
                              HON. TERRENCE G. BERG
                              UNITED STATES DISTRICT JUDGE